## ESTATE OF JAMES MARSHALL, DECEASED. (2)

APPEAL BY SECOND N. BANK FROM THE ORPHANS' COURT OF ALLEGHENY COUNTY.

Argued October 28, 1890—Decided November 10, 1890.
[To be reported.]

1. The Orphans' Court has jurisdiction, upon the petition of a legatee, to decree that assets of the testator's estate, unlawfully pledged by the executor for his own debt, the title of the estate being known at the time of the pledge to both pledgor and pledgee, and being undisputed, shall be surrendered by the pledgee for administration: Odd Fellows Bank's App., 123 Pa. 356.
2. A pledgee in such a case, who took with actual or constructive notice

Statement of Facts.

that the pledge was a breach of trust on the part of the executor, holds as a trustee ex maleficio, and therefore cannot set up title to the thing pledged, by an adverse holding under the statute of limitations, at least in the absence of actual notice to the cestuis que trust of such adverse holding.

3. At all events, when a note, to secure which the pledge was given, has been renewed within six years prior to the commencement of the proceeding by the legatee for the recovery from the pledgee of the assets so pledged, the renewal of the note being accompanied by a renewal of the pledge, the statute of limitations will not avail the pledgee as a defence.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MCCOLLUM and MITCHELL, JJ.

Nos. 56–59 October Term 1890, Sup. Ct.; court below, Nos. 363–366 December Term 1888, O. C.

On February 16, 1889, to No. 363 December Term 1888, of the court below, Anna Frances Marshall, a legatee under the will of James Marshall, deceased, filed her petition averring that James Marshall, Jr., who was one of the executors of said testator, being engaged in business individually under the name of James Marshall & Co., procured the discount of a certain note at the Second National Bank of Allegheny, for his own benefit and in connection with his said business, and unlawfully pledged to said bank, as collateral security for said note, 75 shares of the Farmers Deposit National Bank, belonging to the estate of said testator and held in trust by the executors for uses and purposes set forth in said will; that said James Marshall, Jr., having become insolvent, was afterwards discharged from his executorship; that Thomas M. Marshall, Mark W. Watson and Matilda Marshall, the remaining executors, being notified by the petitioner to take proper legal steps for the recovery of said stock, neglected and refused so to do; praying, in substance:

1. That said remaining executors be required to institute proceedings for the recovery of said stocks and moneys, and that said bank be restrained in the meantime from otherwise disposing of the same; or

2. That the court, by order or decree, compel said bank to re-transfer said stocks, and pay over the dividends collected by it thereon to said executors.

At Nos. 364, 365, 366 of the same term, similar petitions were filed on the same day by Anna F. Marshall, as to similar pledges of other stocks belonging to said estate made by James Marshall, Jr., to the Second National Bank of Allegheny. The petitions at Nos. 364 and 365 related to certain shares of the stock of the Allegheny Gas Company, and that at No. 366 to certain shares of the stock of said Second National Bank.

Upon the filing of the petitions, citations were awarded by the court against all parties in interest. Thomas M. Marshall, executor, and Mrs. Watson, Mrs. Talbot and James Marshall, Jr., children and legatees of James Marshall, deceased, made no answer, and the petition was taken pro confesso as to them. M. W. Watson and Mrs. M. Marshall, executors, filed separate answers, substantially admitting the averments of the bill, and asking to intervene as parties petitioning. The Farmers Deposit National Bank and the Allegheny Gas Company disclaimed interest in the subject-matter of the controversy, and submitted themselves to the judgment of the court. The Second National Bank filed answers in which it substantially set forth:

1. That said loans were made to the firm of James Marshall & Co., on the representations of James Marshall, Jr., that the said firm was composed of the estate of James Marshall, deceased, and himself, who were associated in the business of said firm, and that he, the said James Marshall, Jr., was the acting and managing partner of said firm; that all said loans were made on the credit of said firm so constituted and composed, and the money was paid to said James Marshall, Jr., as the active business partner of said firm of James Marshall & Co.; that it was informed and believed and expected to be able to prove, that the business of James Marshall & Co. was carried on by James Marshall, Jr., for the benefit of himself and the three other legatees and devisees named in the will of James Marshall, deceased, and that said legatees received, enjoyed, participated in, and used their respective shares of the profits of said firm.

2. That respondent had actually held said stocks more than six years, and had acquired title thereto by virtue of the statute of limitations.

3. That the court had no jurisdiction in the premises.

Decision of Court below.

After a hearing upon testimony, the four cases being by consent heard together, the court, HAWKINS, P. J., filed the following decision:

### FINDINGS OF FACT.

James Marshall died in 1869, leaving a will in which he appointed Thomas M. Marshall, Mark W. Watson, James Marshall, Jr., and Matilda Marshall, executors and trustees, and gave his estate to said trustees for an indefinite term, for the benefit of his widow and children. Anna F. Marshall, the present petitioner, who was the youngest child, attained her majority in August, 1886. All the executors and trustees qualified; but James Marshall, Jr., became the acting executor and trustee, and so continued until April 16, 1883, when, having become insolvent, he ceased to act, and the surviving executors and trustees assumed the duties of the trust. James Marshall, Jr., was discharged as executor and trustee in 1887. While acting executor and trustee, James Marshall, Jr., trading as James Marshall & Co., procured certain notes to be discounted by the Second National Bank of Allegheny, upon the security of stocks belonging to the estate of James Marshall, deceased, as follows:

1. March 26, 1883, note signed by Oliver Wylie, payable thirty days after date, for $14,000, for which was pledged as collateral a certificate for 75 shares of the capital stock of the Farmers Deposit National Bank of Pittsburgh, showing on its face that it belonged to the estate of James Marshall, deceased. This note was the last renewal of a series of notes beginning May 11, 1881. The first pledge of the stock was made May 1, 1882; and renewed pledges were made with the successive renewals of the notes aforesaid. Dividends have accrued and are in the hands of the Farmers Deposit National Bank amounting to $7,200.

2. April 7, 1883, note signed by John D. McCune, payable thirty days after date, for $12,000, for which was pledged as collateral, by James Marshall, Jr.'s transfer on the books as acting executor, 300 shares of the capital stock of the Allegheny Gas Company belonging to the estate of James Marshall, deceased.* This note was the last renewal of a series of notes

---

* The testimony taken in the court below showed that the certificate of this stock, and also the certificate of the 390 shares in the same company, mentioned afterward as pledged for the Hetzel note, were made out in the name of " James Marshall's Estate."—REP.

Decision of Court below.

beginning May 11, 1881. The first pledge of this stock was made May 10, 1882, and renewed pledges were made with the successive renewals of the notes aforesaid. Dividends on these stocks have been received by the pledgees.

3. March 30, 1883, note signed by C. H. Hetzel payable 30 days after date for $15,000, for which was pledged as collateral, by James Marshall, Jr.'s transfer on the books as acting executor, 390 shares of the capital stock of the Allegheny Gas Company belonging to the estate of James Marshall, deceased. This note also was the last renewal of a series of notes beginning February 28, 1882. The first pledge of this stock was made March 25, 1882, and renewed pledges were made with the successive renewals of the notes aforesaid. The Second National Bank has received in dividends on 690 shares of gas stock, $12,660.

4. March 27, 1883, note signed by J. N. Davidson payable 30 days after date, for $2,500, for which was pledged to said J. N. Davidson (who was cashier of said bank), by James Marshall, Jr.'s transfer as acting executor, 20 shares of the capital stock of said Second National Bank, belonging to the estate of James Marshall, deceased.* This note was the last renewal of a series of notes beginning November 15, 1881. The first pledge of this stock was made November 15, 1881, and renewed pledges were made with the successive renewals of the said notes. Fifteen of these shares were sold by Mr. Davidson, under power contained in the note for which they had been pledged as collateral; and the remaining 5 shares are held by him subject to the order of the executors. The bank received dividends on this stock.

All the notes prior to the last were surrendered by the Second National Bank upon renewals.

These discounts were made by said bank for, and the proceeds were used by James Marshall & Co. James Marshall, Jr., represented to the discounting bank, and it believed, that the estate of James Marshall, deceased, was in the firm. James Marshall was in his lifetime a partner, but the firm was dissolved by his death, and James Marshall, Jr., had no authority

---

*As to the lending of money by a national bank upon the security of its own shares, see Bank v. Lanier, 11 Wall. 369; National Bank of Xenia v. Stewart, 107 U. S. 676.—REP.

Decision of Court below.

whatever to bind the estate. The estate had no need of these discounts, and received no benefit, directly or indirectly, from them. They were made without the consent or knowledge of either the co-executors or co-legatees of James Marshall, Jr.

As already stated, James Marshall, Jr., having become insolvent, ceased to act as executor and trustee in 1883, was discharged from his trust in 1887, and thereupon the surviving executors and trustees assumed the duties of the trust, and have so continued since. James Marshall, Jr., filed no account of his administration. He was very largely indebted to the estate. . . . .

These pledgees do not claim absolute title to the stock held by them respectively. The position taken by their counsel, in argument, was that because the original pledge was illegal as against the estate, their holding thereby became adverse, and the statute of limitation, running from that date, perfected their title as pledgees as against the estate.

### CONCLUSIONS OF LAW.

1. It was not denied in argument, that, assuming this court had jurisdiction over the controversy here, Anna F. Marshall had a right, as party petitioner, to institute these proceedings. The reasons for her action were the same as those which were recognized as being sufficient in the Odd Fellows Bank's App., 123 Pa. 356. She was beneficially interested; the stocks were needed for the due administration of the estate, and the surviving executors had refused or neglected to take action.

2. And the same reasons exist here, as there, for maintaining the jurisdiction of this court to afford relief. The respondents. admit that at the time of the original pledge the stocks were the property of the estate of James Marshall, deceased, and that they were illegally pledged for the individual debt of James Marshall, Jr. This court had jurisdiction of the settlement of the estate of James Marshall, deceased, and its possession of these stocks was an essential step towards that settlement. It had, in fact, possession of them, for the possession of its officer is the possession of the court: Kerr on Receivers, 165; Wheatland's App., 125 Pa. 38. Could that officer have successfully denied accountability for these stocks, and held them for his own use in defiance of the jurisdiction of this court? If not, can his pledgee, who took with notice that the pledge was

Decision of Court below.

made in violation of a trust, claim an immunity which he could not have successfully claimed?

It is well settled, in courts of equity, that trust funds, so taken, may be followed so long as they can be identified, no matter through how many hands or transmutations they may have passed; and the wrongful holder becomes a trustee ex maleficio, subject to the same rules and remedies as the lawful trustee: Perry on Trusts, § 245. This court is a court of equity, and within the orbit of its jurisdiction administers equity by the same rules and remedies. What more appropriate, indeed, what other tribunal could there be to follow these assets? It has exclusive jurisdiction of the settlement of this estate; and for the purpose of that settlement, had these stocks in its possession when they were cloigned. The pledge, in contemplation of law, was a contempt, and punishable as such exclusively by this court: Kerr on Receivers, 165.

It will readily be conceded that, in those cases in which this court has never had possession of the assets of decedents, as where the pledgee claims title derived through a stranger to the estate; or where, as in Delbert's App., 83 Pa. 468, an executor de son tort has taken possession, the jurisdiction belongs to another tribunal. But here, possession of the stocks was admittedly in the hands of the officer of this court, and was illegally taken from him. They have been traced into these respondent's hands and identified. Those in possession are trustees ex maleficio, claiming title through a trustee who was subject to the jurisdiction of this court, and recovery of possession of these stocks is essential to the exercise of the exclusive jurisdiction of this court in the settlement of the estate of James Marshall, deceased. It cannot be doubted, that in these circumstances, this court can maintain its jurisdiction as a court of equity, and restore these assets to their original status. Its equitable jurisdiction having once attached, is sufficient to embrace every relief necessary to a full disposition of the case. " When a cause is once within the grasp of a court of equity, or a court lawfully exercising equity powers, it has no need to call in the aid of a court of law. Its process is plastic, and its power is only limited by the necessities of the case, and by its duty to administer equity in accordance with established rules. In such case, it needs

Decision of Court below.

no other court to finish its work:" Odd Fellows Bank's Appeal, supra.

For these reasons the plea to the jurisdiction must be overruled.

3. Nor can the plea of the statute of limitations be sustained.

Treating the pledge of stocks as a contempt, the only admissible answer of the pledgees is to restore the stocks and purge themselves of contempt: Kerr on Receivers, 165. Contempts may relate, as well to misconduct tending to obstruct the proceedings of courts or mar their efficiency, as to disobedience to decrees; and it is obviously essential to the purposes of their jurisdiction that they should have power to punish such misconduct whenever it shall be brought to their notice: Wells on Jur., § 178. When the jurisdiction of a court has once attached, time cannot run against its exercise. The collusion of its officers might otherwise defeat the administration of justice, without any default on the part of those for whose benefit such jurisdiction was established. James Marshall, Jr., was amenable to the jurisdiction of this court, as acting executor of the will of James Marshall deceased, and it must be conceded that he could not have pleaded the statute of limitations as against the exercise of that jurisdiction, in respect of the stocks; his pledgees are trustees ex maleficio, who sit in his seat, amenable to the same jurisdiction; and there is no reason why they should have privileges which he could not have claimed.

Treating the pledge as affecting the beneficial ownership of this petitioner, these trustees ex maleficio are subject to the same rules and remedies as, and can have no greater rights or privileges than James Marshall, Jr. They hold these stocks under an express trust, indefinite in its duration, which was created by the will of James Marshall, deceased, and of which this court has exclusive jurisdiction; and the question now involved is between them as trustees and their cestuis que trust. Even, therefore, upon the principle announced in Yorks' App., 110 Pa. 69, the statute of limitations has no application. There is no analogy with the case of a creditor whose claim has not been seated on the trust by action, and who may resort for that purpose either to the Court of Common Pleas or this court: Reber's App., 125 Pa. 20. It may be that if a trustee

Decision of Court below.

repudiates the trust by clear and unequivocal acts or words, and claims thenceforth to hold the assets as his own, and such repudiation and claim are brought to the notice of cestuis que trust, who are sui juris, long acquiescence may raise a presumption of abandonment on the part of such cestuis que trust. But notice of such repudiation and claim must be brought home to the cestuis que trust; the attitude of the trustee must be continuously hostile, and there must be no room for mistake or misunderstanding as to the character of his holding: Perry on Trusts, § 864; Fox v. Cash, 11 Pa. 207.

Adverse holding implies notice: Johnston v. Humphreys, 14 S. & R. 394. Lord Justice Knight BRUCE said, in Stone v. Godfrey, 5 De G. M. & G. 86, that where one entered into possession as trustee, he could not be permitted to set up a possession or title in himself adverse to his cestui que trust without first resigning the trust and delivering over possession, for no claim could be made through a breach of trust. So, it was said in Pierce v. McKeehan, 3 W. & S. 280, that a trustee can acquire no right, nor those in privity with him, by a breach of trust. Even a tenant must yield up possession of land before he can contest his landlord's title. The relation of cestui que trust to his trustee being one of confidence that his estate will be preserved for him, the burden is clearly on the trustee to give him such notice as will enable him to protect his interests from any adverse or inconsistent claim on the part of the trustee. Constructive notice cannot be sufficient, because, owing to the confidential relations of the parties, the cestui que trust cannot be supposed to be on his guard. In the nature of the case, actual notice must be essential.

What lapse of time after actual notice has been given, will bar the cestui que trust, must depend upon the circumstances of each case. The result of the authorities is stated in Perry on Trusts, § 864, to be twenty years. In the case of Waterman v. Brown, 31 Pa. 161, upon which respondent relies, six years was adopted by analogy " under the circumstances of the case " as raising a presumption of abandonment; but that was a case between pledgor and pledgee, and lacking in the element of breach of trust. But, assuming that a reasonable period within which the cestui que trust must take action, this petitioner is in time. There was in fact no adverse claim made by these pledgees, as trustees

ex maleficio, until after the last note had been discounted. They admit that until then they supposed the estate of James Marshall, deceased, was in the firm of James Marshall & Co. The whole series of notes, and the successive renewals of pledges were confessedly made upon that supposition. The last pledge was made by James Marshall, Jr., within six years, as collateral security for the last discounted note; there could have been no pledge without actual or implied possession, and his possession was the possession of the estate. The acceptance of the pledge was a distinct recognition of title in the estate within six years. And there was no actual notice of any adverse claim by the trustees ex maleficio until after the last note had been discounted, to any of the parties, trustees, or beneficiaries named in the will of James Marshall, deceased. James Marshall, Jr., asserts that he was not aware the pledge was a breach of trust; and the other parties had no knowledge that the pledge was being made. Three of the four beneficiaries were under disabilities; and of these, Anna F. Marshall, the present petitioner, did not obtain her majority, and was incapable of receiving notice until 1886. There was nothing in the circumstances to put any of these parties other than James Marshall, Jr., upon their guard. These stocks were in the custody and control of James Marshall, Jr., as their trustee; and they had a right to assume that he would faithfully discharge his duty.

So far as this petitioner is concerned, there can be no difference between an actual and a constructive breach of trust; the results are the same to her, and she can repudiate either, in the assertion of her rights of property. It is therefore immaterial to the issue here, whether these pledgees had, or had not, actual notice that the pledge was made in breach of the trust under which the stocks were held, as there was enough to put them upon inquiry; inquiry became a duty, and would have led them to a knowledge of the facts. The absence of any reference in the will to the firm of James Marshall & Co., ought of itself to have excited inquiry. There is no evidence that they even examined the will, or made inquiries of the co-executors or co-legatees of James Marshall, Jr., or consulted an attorney with reference to the matter. They appear to have trusted alone to the representations of James Marshall, Jr., and have themselves to blame for their credulity. It would be simply a perversion

### Decision of Court below.

of justice to hold that in such circumstances, this petitioner, without any default on her part, should lose her beneficial interest in these stocks.

Whether, therefore, these pledges be treated as contempts, or as affecting the beneficial ownership of this petitioner, they were breaches of trust and invalid, and made these pledgees trustees ex maleficio, in privity with James Marshall, Jr., who was the lawful trustee, and like him amenable to the jurisdiction of this court. It follows, that the stocks so pledged in breach of the trust under which they were held, remaining unsold, the proceeds of those sold, and all accruing dividends in the hands of said trustee ex maleficio must be transferred to the rightful custodians, the surviving executors of the will of James Marshall, deceased. It may well be that as between James Marshall, Jr., and his pledgees, the latter have an equity as against such share as shall be awarded the former in distribution, upon settlement of the estate of said decedent, and the transfer must be made without prejudice to such claim.

Formal decrees were then entered, adjudging that the stocks in controversy belonged to the estate of James Marshall, deceased, and were part of its assets; ordering that the respective corporations by which said stocks were issued should recognize the executors and trustees under the will of said decedent as the owners thereof, and account for and pay over to said executors and trustees all dividends on said stocks not previously paid to them; that the Second National Bank of Allegheny deliver up to said executors and trustees the certificates of stock pledged with it, in the case of the shares of its own stock pledged by James Marshall, Jr., re-assigning and delivering up the five shares which remained unsold, and accounting for and paying over the sum of $2,550, as the proceeds of those sold under the pledge, with interest thereon from October 1, 1883; and that the trustees should hold said stocks, cash and dividends, subject to the right, if any, of said bank to claim, on final distribution of the estate, the share or interest therein which may be determined to belong to James Marshall, Jr.

Thereupon the Second National Bank took these appeals, specifying in substance, that the court erred:

In assuming jurisdiction of the disputed question of the title

to said stock; in making the several parts of the decrees; in not decreeing that the appellant's possession as pledgee was adverse to the estate of James Marshall, deceased, and, under the statute of limitations, ripened into a perfect legal title, to the extent of the bank's lien and estate therein, with remainder over to the executors and trustees; in not finding that the pledges by James Marshall Jr., acting executor, were notice to his co-executors and co-trustees; and in not applying the principle that when the legal title to stock is vested in trustees, and, failing to sue for it within six years, they are barred, their cestuis que trust are barred also.

*Mr. Marshall Brown,* for the appellant:

1. If the ruling in Odd Fellows Bank's App., 123 Pa. 356, is to stand, it is unnecessary to discuss the question of jurisdiction. Assuming, as matter of law that the estate of James Marshall deceased, was not in the firm of James Marshall & Co., and that James Marshall, Jr., was not authorized to use or pledge stocks of the estate in connection with the firm business, as was held in First N. Bank's App., 19 W. N. 309, yet the appellant believed otherwise, and upon such belief in good faith made the loans and parted with its money. And it claims an absolute title under the statute of limitations, by continuous possession of the stock for more than six years. But, as showing its good faith, it is willing that an equitable decree be made, directing that whatever remains of the proceeds of the stock and dividends, after payment of its claims, shall be paid to the executors and trustees of the estate.

2. Is the statute of limitations a bar? A trust to which the statute is inapplicable must be (*a*) direct and continuing, (*b*) exclusively cognizable in equity, and (*c*) arising between trustee and cestui que trust. All three of these elements must enter into its composition: Yorks' App., 110 Pa. 79; Lyon v. Marclay, 1 W. 271; Finney v. Cochran, 1 W. & S. 112; App v. Dreisbach, 2 R. 287; Zacharias v. Zacharias, 23 Pa. 452; Barton v. Dickens, 48 Pa. 518; Sankey v. McElevey, 104 Pa. 265; Wickersham v. Lee, 83 Pa. 422; Glenn v. Cuttle, 2 Gr. 273; Alexander v. Leckey, 9 Pa. 120; Hamilton v. Hamilton, 18 Pa. 20; Bull v. Towson, 4 W. & S. 557; Neely's App., 85 Pa. 387. When concurrent remedies, legal and equitable,

Arguments.

exist, the statute applies; and if it is a bar at law, it is so also in equity: Bank of U. S. v. Biddle, 2 Pars. 31; Strimpfler v. Roberts, 18 Pa. 283; Curcier's Est., 28 Pa. 261; Todd's App., 24 Pa. 429; Spering's App., 71 Pa. 11; Bickel's App., 86 Pa. 204; Irwin v. Cooper, 92 Pa. 298; Yorks' App., 110 Pa. 75; Zacharias v. Zacharias, 23 Pa. 455. If the Orphans' Court has jurisdiction of this controversy as to title, its jurisdiction is not exclusive. The executors may proceed by action at law or bill in equity, and in either they would be met by the bar of the statute. Like concurrent remedies, legal and equitable, exist to enforce and protect the rights of the bank.

3. The right of the executors to recover against the bank, measures that of the legatees. If the former cannot recover directly in their own names, they cannot do so indirectly through an action in the names of the legatees. The rule between legatee and executor that an express continuing trust is not affected by the statute, has no application to third persons; and, if the executors, who had the legal title to the stock and could have sued for it are barred, so are their cestuis que trust: Smilie v. Biffle, 2 Pa. 52; Molton v. Henderson, 62 Ala. 426; Rush v. Barr, 1 W. 110; Lyon v. Marclay, 1 W. 271; Wickersham v. Lee, 83 Pa. 422; Coleman v. Walker, 3 Met. (Ky.) 65 (77 Am. Dec. 163); Llewellyn v. Mackworth, Barn. Ch. 445; Bond v. Hopkins, 1 Sch. & Lef. 429; Medlicott v. O'Donnell, 1 B. & B. 156; Perry on Trusts, § 858; Maus v. Maus, 80 Pa. 203; Warn v. Brown, 102 Pa. 353; Williams v. Otey, 8 Humph. 563 (47 Am. Dec. 632); Wooldridge v. Bank, 1 Sneed 297; Pendergast v. Foley, 8 Ga. 1; Goss v. Singleton, 2 Head. 67; Long v. Cason, 4 Rich. Eq. 60; Herndon v. Pratt, 6 Jones Eq. 327; Wingfield v. Virgin, 51 Ga. 139; Brady v. Walters, 55 Ga. 25; Varner v. Gunn, 61 Ga. 54; Waring v. Railroad Co., 16 S. C. 417; Love v. Love, 65 Ala. 555; Bisph. Eq., 4th ed., 94 (4).

4. When did the statute begin to run? It commenced running from the very moment when the bank got possession of the stock, for at that moment an action accrued to the executors for its recovery; and possession thereafter for more than six years ripened into a legal title: Waterman v. Brown, 31 Pa. 161; Zacharias v. Zacharias, 23 Pa. 454; Downey v. Garard, 24 Pa. 52; Campbell v. Boggs, 48 Pa. 524; Sankey v.

McElevey, 104 Pa. 273. The possession of the bank lacks every element of fraud or concealment, and even of silence, to stay the running of the statute. But the appellees claim that the pledging of the stock was illegal at its inception, and that the bank was visited with notice of its illegality. If this be so, the rule of notice must work both ways. The analogy drawn by the court below between the possession of an executor and that of a receiver, is fallacious. To hold that trust assets held by an executor are in possession of the Orphans' Court, and therefore no limitation can run against its jurisdiction, is to establish an anomaly in jurisprudence, and to depart from a long line of precedents, uniform and unbending, to the contrary. Nor does the fact that the loans were renewed within six years, toll the statute. The renewal notes in no way affected the bank's possession, or the right of the executors to bring suit, or the running of the statute from the inception of the bank's possession.

5. The claim that the statute would not begin to run until the cestuis que trust had knowledge of the bank's possession, is unsupported by authority: Sankey v. McElevey, 104 Pa. 265; Hostetter . v. Hollinger, 117 Pa. 611. James Marshall, Jr., had full knowledge of the facts, and his knowledge was notice to his co-executors and to the cestuis que trust whom they represented: Bisph. Eq., 4th ed., 337 (3) ; Perry on Trusts, § 222; Reed's App., 34 Pa. 207; Astor v. Wells, 4 Wheat. 466; Bracken v. Miller, 4 W. & S. 102; Blair v. Owles, 1 Munf. 38; Brotherton v. Hatt, 2 Vern. 574; Mechanics' Bank v. Seton, 1 Pet. 309; Jackson v. Sharp, 9 Johns. 163; Le Neve v. Le Neve, 3 Atk. 646 ; Tunstall v. Trappes, 3 Sim. 301; Jackson v. Winslow, 9 Cow. 13; Bank of U. S. v. Davis, 2 Hill 451 ; Fuller v. Bennett, 2 Hare 202; Maddox v. Maddox, 1 Ves. Sr. 61 ; Ashley v. Baillie, 2 Ves. Sr. 368; Sheldon v. Cox, 2 Eden 224; Sterling Br. Co. v. Baker, 75 Ill. 139; Hovey v. Blanchard, 13 N. H. 145; Griffith v. Griffith, 9 Paige 315; Wade on Notice, § 681; Fulton Bank v. Canal Co., 4 Paige 127; North R. Bank v. Aymer, 3 Hill 262; National S. Bank v. Cushman, 121 Mass. 490; Edwards v. Thomas, 2 Mo. App. 282; Watson v. Wells, 5 Conn. 468. The co-executors, moreover, had actual knowledge of the pledges as early as April, 1883. With knowledge that the

statute of limitations had started on its journey, they neglected to bring suit from that time until February 16, 1889 ; it has therefore intervened to prevent recovery : Byrne v. Frere, 2 Moll. 137 ; Sankey v. McElevey, 104 Pa. 273.

*Mr. D. T. Watson* (with him *Mr. A. M. Brown* and *Mr. J. H. White*), for the appellee :

1. The appellant cannot set up the statute of limitations, for the reason that it held the stock merely as collateral and did not claim to own it, and the statute does not run in favor of a pledgee, so long as he holds in that character : Edwards on Bailment, § 321 ; Humphrey v. Bank, 113 Pa. 422 ; Reynolds v. Cridge, 131 Pa. 194 ; Prentiss v. Hannay, 4 Wh. 508 ; Trickett on Limitations, § 210 ; Brown v. Tyler, 8 Gray 140 ; Hancock v. Insurance Co., 114 Mass. 156 ; Story on Bailments, § 346.

2. Another reason prevents the bank from pleading the statute, viz., that it held the stock as a trustee ex maleficio. It was visited with notice of the provisions of the will : Garrard v. Railroad Co., 29 Pa. 158 ; Hill v. Epley, 31 Pa. 336 ; Smith v. Ayer, 11 Otto 326. Taking with notice of the fraudulent use, it was a participant in the executor's breach of duty : Wood's App., 92 Pa. 379. It can no more set up the statute, therefore, than its co-conspirator, James Marshall, Jr., could. In cases of fraud by a trustee, the statute does not run until discovery$_o$ of the fraud : Hill on Trustees, *266–269. This is such a trust, therefore, as is not barred by the statute : Yorks' App., 110 Pa. 79.

3. But, even if the bank could be regarded as holding the stock adversely to the real owners, the statute of limitations cannot avail it, because the statute could run only from the date of the last pledge, which was within six years of the commencement of the present suit. In order that its title under the statute might mature, the bank must have held for six years uninterruptedly and adversely. An interval or lapse of one instant in the holding, or any interruption in its adverse character, will toll the statute : Clarke v. Dougan, 12 Pa. 87 ; Sailor v. Hertzog, 4 Wh. 259 ; Trickett on Limitations, §§ 74, 75 ; Diller v. Brubaker, 52 Pa. 504 ; Morrell v. Trotter, 12 W. N. 144. Each renewal was such an interruption : Slaymaker v. Gundacker, 10 S. & R. 82.

Opinion of the Court.

4. It was the duty of James Marshall, Jr., himself, to bring an action and recover the stocks. This court has ruled that when a trustee has made an unauthorized pledge of the trust assets, the same trustee can institute legal proceedings to recover them back, and that it is his duty to do so: Abbott v. Reeves, 49 Pa. 494. The statute certainly would run against James Marshall, Jr., only from the dates of the last pledges, and probably only from the maturity of the notes for which those pledges were made: Waterman v. Brown, 31 Pa. 161. This suit of Anna F. Marshall is in lieu of the suit of her unfaithful trustee. If he might sue within six years after the last pledge, can she be barred in less time? There are no equitable circumstances in the case to induce the court to withhold its aid from her.

PER CURIAM:

These cases are important both as regards the principles and the amount involved. The main question, that of the jurisdiction, is settled by Odd Fellows Bank's App., 123 Pa. 356, a case arising in the same estate as those above stated. In neither case was there any question of disputed title. In the case cited, the title was admitted in the estate of James Marshall by the demurrer; in these cases, the title was shown to be in the same estate: it appeared upon the face of the papers when they were unlawfully pledged for the firm debt of James Marshall & Co.; it was known at the time to both pledgor and pledgee, and is not disputed. This leaves remaining only the question of the statute of limitations, and this is so well discussed by the learned president of the Orphans' Court that we cannot add anything to what he has so well said.

The decree is affirmed in each case, and the appeal dismissed at the costs of the appellant.