## Martha K. Rich *v.* Black & Baird et al., Appellants.

[Marked to be reported.]

*Principal and agent—Trust and trustees—Purchase by trustee at his own sale—Public policy.*

On grounds of public policy, purchases made on their own account by agents or trustees for sale, will be set aside at the instance of the cestui que trust, even where the latter has sustained no actual injury.

Where a cestui que trust seeks to set aside a sale made by a trustee to himself individually, the cestui que trust is not bound to prove nor is the court bound to judge, that the trustee has made a bargain advantageous to himself.

In such a case the cestui que trust must move to set aside the sale within a reasonable time; but what shall amount to a reasonable time will depend on circumstances, and lies in the discretion of the court. In the absence of special circumstances which may lengthen or shorten the time the analogy of the law is followed.

Plaintiff placed real estate in the hands of defendants to sell, naming a minimum price. The defendants made no efforts to obtain competitive bids, and although naming certain persons to plaintiff as purchasers, really bought in the property themselves. *Held,* that plaintiff was entitled to have defendants account for profits made by them on a resale of a portion of the lands, and for a reconveyance of the unsold portions of the lands.

Argued Nov. 5, 1895. Appeal, No. 222, Oct. T., 1895, by defendants, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1895, No. 820, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account and for a reconveyance of real estate.

The case was heard on bill, answer and proofs, by EWING, P. J., from whose opinion the facts appear.

It is conceded that Mrs. Rich, the plaintiff, was in December, 1889, the owner of the tract of land, concerning which this contention arises. She resided on Grant avenue, in Allegheny city. Messrs. D. P. Black, M. I. Baird and J. L. Gloninger composed the firm of Black & Baird, who, at that time and before were engaged in business as real estate agents in the city of Pittsburg, doing a very large business and being well

known as such agents and having the confidence of the public. They had numerous employees as salesmen, solicitors, clerks, etc. Mr. E. M. Moore was one of their solicitors and salesmen. He, by direction of Mr. Baird, one of the firm, made special examination to find and obtain for sale by them property in the Twenty-first ward, near Homewood, and he discovered this property as being for sale, and by a sign thereon he ascertained the names of the owners. He thereupon visited the house of Mrs. Rich. He did not see Mrs. Rich at that time but saw her husband, Abraham Rich, who was attending to business for her. After solicitation on his part that Mrs. Rich should put the property in the hands of Black & Baird as her agents for the sale thereof, a verbal agreement was then and there made on the part of Mr. Rich, representing his wife and Mr. Moore, by which the property was placed in the hands of Black & Baird as agents to sell at a minimum price of not less than three thousand dollars an acre, and Black & Baird were to receive a commission of two per cent for their services for the sale so made. The testimony of Mr. Abraham Rich and Mr. A. L. Rich, the son, is positive and absolute in regard to this being the contract, and the testimony of Mr. Moore substantially corroborates it. Whether the testimony of the Messrs. Rich be taken, or the testimony of Mr. Moore representing the firm of Black & Baird be taken alone, and throwing aside the testimony of Messrs. Rich, it constitutes Black and Baird the agents of Mrs. Rich for the sale of this property at this price. This was on or about the 10th day of December, 1889.

Mr. Moore reported to his principal, Mr. Baird, of the firm who had directed him to endeavor to procure this. He was then directed to see Mrs. Rich or her husband, and endeavor to get them to agree to sell the property at $2,500 an acre. Pursuant to this direction Mr. Moore, in about a week after the first agreement, went to the house of Mrs. Rich, and there told Mr. Rich that he did not think it could be sold at $3,000 an acre, and asked him to reduce the minimum price to $2,500 an acre. This was emphatically and decidedly refused. In a few days thereafter he reported that they had sold it at $3,000 an acre. Up to this time no written agreement had been made. The report was that it had been sold to one J. A. Roll. On the 31st of December, 1889, Mr. Moore and some other one

visited the house of Mrs. Rich. The Messrs. Rich testify that Mr. Gloninger of the firm of Black & Baird was present. Mr. Gloninger says he was not, and that he never was at the house. It is perhaps a mistake of identity or a lapse of memory from other numerous transactions having occurred. It is not necessary for us to pass upon this disputed point; it is entirely immaterial. The firm of Black & Baird was, at any rate, represented by Mr. Moore, as their agent and employee in these visits. At that time the three agreements attached to the answer of Black & Baird were executed. The first being the formal agreement by which Mrs. Rich and her husband gave them the exclusive right to sell this property for sixty days at the price agreed on, one fifth cash, with the conditions agreed on in the agreement of sale. And an agreement of Mr. and Mrs. Rich to sell the property to John A. Roll at this price, and on the conditions set out in the agreement. This agreement recited the receipt from John A. Roll of $500, part of the purchase money, and Mrs. Rich executed a receipt to Black & Baird for the $500 as the purchase money of the property, etc.

The $500 was, in fact, paid by Black & Baird. John A. Roll, named as the party to whom they agreed to sell, had never been consulted in regard to the matter, and so far as appears from the testimony, he never knew that his name had been used in the agreement. He was related by marriage to Mr. Baird, and after that time he became an employee of Black & Baird. Mr. Rich, Jr., says that he was told by Mr. Moore that " Roll was a rich old German." Moore says he has no recollection of that. By the agreement one fifth of the purchase money was to be paid in cash on delivery of the deed, December 31, and the $500 was a part of this hand money. A mortgage was to be given for the remaining two thirds.

Mr. Baird says that Mr. T. A. Gillespie was the party for whom the property was really purchased, and that he did not want to be known. Thereupon Black & Baird had the title examined; when it came to the execution of the deed Mrs. Rich or her son and husband were notified that Daniel H. Barr was the actual purchaser, and not John A. Roll. Mr. Baird testifies that after the written agreement to sell to John A. Roll was consummated, and which he intended in fact for T. A. Gillespie, that at Mr. Gillespie's instance he agreed to become pur-

chaser for one half jointly with Mr. Gillespie.   So far as appears from the testimony Mr. Gillespie never paid anything until the first day of February, 1890, when, it is alleged, he sent a check to Black & Baird for $2,250, which would be about one half the cash payment.   Daniel H. Barr was a clerk and employee of Black & Baird, in their office at this time, and was unknown to the plaintiff or her husband or son.   The son testifies that he was not told who Barr was or that he was an employee in the office, and that he supposed he was one of the firm of the Post Publishing Company.   There is some evidence that the son was told sometime afterwards that Barr was an employee in the office, which he denies.

We think there is not sufficient evidence, and find as a fact that the evidence fails to sustain that either Mrs. Rich or her husband or son were ever informed of the fact that Daniel H. Barr was an employee in the office of Black & Baird until after the purchase money mortgage had been paid and satisfied.   And while they may have suspected that Black & Baird had some interest in this purchase, they did not know the fact until after the purchase money mortgage had been paid and satisfied. There is no pretense that Mrs. Rich herself ever knew or suspected that anybody else than Daniel H. Barr was the bona fide purchaser.

On the 24th of January, 1891, T. A. Gillespie executed the following paper:

"PITTSBURG, Pa., January 24, 1891.

"In consideration of the sum of $2,250 in cash, the receipt whereof is hereby acknowledged, I hereby transfer to Black & Baird all my right, title and interest in the property purchased of Martha K. Rich, and deeded to Daniel H. Barr.   Witness my hand and seal the day and year above written.

[Signed]                    "T. A. GILLESPIE."

This is the only paper in evidence indicating equitable title in Gillespie.   It is not pretended he ever had any written acknowledgment.   It is alleged there was a receipt given him when he paid the $2,250, but that is not produced, nor is Mr. Gillespie called.

The testimony of Mr. Baird is to the effect that this purchase of Gillespie's equitable interest in the property was on

behalf of Mr. Alfred A. Neeb, who says that he paid this amount to Black & Baird, and became the equitable owner of the interest of Gillespie. On March 19, 1891, Mr. Barr executed to M. I. Baird and A. L. Neeb sixty-four different deeds for the same number of lots in a plan, which deeds were never put on record, but which were held "in case of accident to, or absence of Mr. Barr," according to Mr. Baird's testimony. But thereafter Mr. Barr continued to execute deeds under the direction of Baird, or Black & Baird, to other purchasers for these identical lots. On the delivery of the deed Black & Baird received their commission of two per cent, $416.64, from Mrs. Rich; Black & Baird immediately took possession of the property, or took charge of the property, and had a plan of lots laid out and made sales; Barr being a mere figurehead, never paid anything on account of the purchase money or anything else. The deed of Mrs. Rich and the bond and mortgage of Barr are dated February 1, 1890, but they were not, in fact, delivered until March 3, 1890.

As to the firm of Black & Baird, it is due to Messrs. D. P. Black and J. L. Gloninger to say that their own positive evidence shows (and there is nothing to contradict it) or to cause us to doubt it, that they were not parties to this transaction, and that they did not have a personal knowledge of it. The business was transacted by Mr. Baird, of the firm. But the business was done by Mr. Baird as a member of the firm, which had contracted with Mrs. Rich to sell the property for her. What are the conclusions to be drawn from this testimony? First, Black & Baird were the agents of Mrs. Rich to sell this property, and it was their duty to sell it at the very best price they could obtain. The law governing these relations has been so often laid down that it is not now necessary to repeat authorities. The principle is a very old one, and we have a written declaration of it by the wisest One who ever spoke on earth in the very terse expression, "Ye cannot serve God and mammon." It was the duty of Black & Baird and each member of the firm and their agents to get the best possible price for this property. By their own showing they were interested for another against the owner, and no better illustration of the impropriety of such a relation can be shown than in this case, where immediately after taking the agency, their employee was directed to try and

obtain the property at $500 an acre less than the price. The law does not permit this. The commission of $416.64 which was received by Black & Baird on the 3d of March was an assertion of their continued agency.

Under the clearly proven facts in this case, we are of the opinion that Black & Baird were the real purchasers of the ground; they furnished the money to purchase it in the name of J. A. Roll without any authority from him. They did not make known their true relation in the case. One of the firm, and for the purposes of this case as to Mrs. Rich it is the same as if it was all the members of the firm, was in fact the purchaser, and Mr. Gillespie simply had an interest in it with him, taking the testimony in the most favorable light for the defendant.

Clearly the commission of $416.64 received by the defendants was improperly taken, and should be refunded. If Mr. Baird had made known to Mrs. Rich at the time that they were the purchasers and had offered to purchase it at $3,000 an acre and the offer had been accepted, that would have been all right. The fact that a man or a firm is engaged in the real estate business does not prevent them from purchasing real estate for themselves, but it must be done openly, and must be done with the knowledge of the seller, and where they purchase for their own private use and are the principals they must make known the fact that the purchase is for themselves, whether it be in their own name or another's. The proper thing to have done was for Mr. Baird to have made the offer directly; very likely it might have been accepted, because it does not appear that the price was an inadequate one at the time. But it was their duty to get the best possible price for the property, and we are of the opinion that under the facts in the case as found by us, and on the testimony, the defendants, Black & Baird, should be required to account for the money that is in the hands of the firm as realized from the sale over and above the purchase money paid to Mrs. Rich. As between the partners of the firm Milton I. Baird alone is accountable. Daniel H. Barr is but a trustee.

The case is ruled by the case of Rice v. Davis, 136 Pa. 439.

And now, July 6th, this case having come on to be heard on bill, answer and testimony taken before the court, and having been duly argued by counsel; upon consideration it is adjudged and decreed that Daniel H. Barr be and is held as trustee of the

property described in the bill and of the portions remaining unsold, and it is ordered that Black & Baird to wit, Milton I. Baird, J. L. Gloninger and David P. Black, account to the plaintiff for the moneys and property received from the sale of this land that has been conveyed by the plaintiff to Daniel H. Barr, as set forth and described in the pleadings.

The case is referred to George W. Williams, Esq., as referee to take testimony and state an account and find what portions of the land remain unsold, in accordance with the opinion of the court and this decree, and in taking such account he is authorized to take testimony to ascertain the legitimate expenses of Black & Baird, or Milton I. Baird in the division of the property and the making of sales, and to charge the defendants only with the profits made or coming to either the firm of Black & Baird, or to M. I. Baird, individually, and that the said referee make report to the court of his proceedings and finding in the case. This order not to interfere with any bona fide sales made heretofore on behalf of Daniel H. Barr, whether consummated by deed or otherwise.

*Error assigned* was above interlocutory decree.

The appeal in this case was taken under the act of June 24, 1895, P. L. 243, entitled " An act authorizing appeals to be taken in equity cases of account, where the liability to account is in issue from the preliminary order or decree of court requiring an account."

*J. S. Ferguson, E. G. Ferguson* with him, for appellants.

*M. A. Woodward,* for appellee, cited, Bigelow on Fraud, 207.

OPINION BY MR. CHIEF JUSTICE STERRETT, January 6, 1896 :

The rule of public policy which avoids, at the instance of the cestui que trust, purchases made by agents for sale is practically absolute in its character. Courts of equity view such transactions with jealous eye ; and it is only under special circumstances amounting to a dissolution of the trust relation, when the parties have dealt at arms length, that their validity is recognized : Davoue v. Fanning, 2 Johns. Ch. 254. And the reasons are obvious. On the one hand, the relation which such

agents bear is confidential, and disarms the vigilance of their principals; it affords peculiar facilities for obtaining exclusive information in respect of the property intrusted to them for sale; their employment implies that they have superior advantages for making sales, and that they will use every effort and means to obtain the highest price for the benefit of their principal. On the other hand, their individual interest is to purchase at the lowest price, and places them in a position which is inconsistent with the faithful and proper discharge of the duties of the trust. The opportunity will naturally lead to temptation to abuse, and, as was aptly said by Mr. Chancellor Kent in Davoue v. Fanning, supra, be "poisonous in its consequences. The cestui que trust is not bound to prove nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so and yet the party not have it in his power, distinctly and clearly, to show it. There may be fraud, as Lord HARDWICKE observed, and the party not able to prove it." Thus an agent by virtue of his trust relation, may discover valuable minerals in the land, and locking the knowledge in his breast, take advantage of it in making a contract with his cestui que trust; if he deny it, how can the court find the fact? "The probability is that a trustee who has once conceived such a purpose will never disclose it, and the cestui que trust will be effectually defrauded:" Ex parte Lacey, 6 Ves. 627. So he may take advantage of his superior knowledge of the market and skill in manipulation to obtain results beneficial to himself. "It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation that the rule does and will permit the cestui que trust to come, at his own option, and without showing actual injury, and insist upon having the experiment of another sale:" Davoue v. Fanning, supra; or as was held in our own case of Swisshelm's App., 56 Pa. 475, treat the purchase as inoperative in respect of the land unsold by the trustee, and compel an account of the proceeds of sale made by him to innocent purchasers for value. "This is a remedy that goes deep, and touches the very root of the matter;" Davoue v. Fanning, supra; Leisenring v. Black, 5 Watts, 303; Parshall's App., 65 Pa. 224; Rice v. Davis, 136 Pa. 439; Murphy v. O'Shea, 2 J. & S. 420. The cestui que trust must it is true move within

a reasonable time; but what shall amount to a reasonable time will depend on circumstances and lies in the discretion of the court. In the absence of special circumstances, which may lengthen or shorten the time, the analogy of the law is followed: Marshall's Est., 138 Pa. 285.

These appellants misapprehend the rationale of this rule. They insist that because, as they claim, the sale was satisfactory to Mrs. Rich, the rule has no application. Conceding that in the first instance it was satisfactory, that fact would not take away her option to rescind; for these appellants then and for a long time afterward ostensibly maintained toward her the character of agents for sale, and willfully concealed the fact of their own interest; they maintain their character of inconsistency even now by claiming not only title as purchaser, but commissions as agents for sale. Roll, whom they first reported as the purchaser, confessedly knew nothing of it; the alleged interest of Gillespie and Neeb is more than doubtful, and, if it ever existed, was soon parted with; to all practical intents and purposes these agents were the real purchasers without the knowledge of their cestui que trust: Rosenberger's App., 26 Pa. 67. However Mrs. Rich may have felt in the first instance in regard to the sale, it is not likely that it would have been satisfactory had she been fully informed of the facts. When she gave her agents a minimum price, it was manifestly intended as a guide to them in negotiating sale, and implied a just expectation on her part, and an engagement on theirs, that they would make an honest endeavor to obtain a higher price. If Roll, Gillespie and Neeb were really intending purchasers, the obvious course was that these agents for sale should take competitive bids; they did not occupy the position of middlemen with equal duty to both; their primary duty was to Mrs. Rich. But, so far as appears, no bona fide effort was made by them to perform this duty; instead, Mrs. Rich was asked to take less, and when this was refused they hastened to avail themselves of the minimum price in their own interest; and had already made large profits before Mrs. Rich's discovery of the facts. If they could realize profits for themselves, they could and should have done so for their cestui que trust; that was their employment and that their undertaking; and equity will treat that as done which ought to have been done. To sustain the purchase made in

these circumstances would work " actual injury " to Mrs. Rich, tend to encourage breaches of trust and violate a wise rule of public policy.

Having taken action in time, the plaintiff was entitled to the relief which the decree of the court below is intended to secure.

Decree affirmed and appeal dismissed with costs to be paid by appellants, and it is ordered that the record be remitted to the court below for further proceedings.