Argued December 17, 1908, decided January 26, 1909.

## FISK v. WAITE.

[99 Pac. 283.]

BROKERS—INDIVIDUAL INTEREST—CONTRACT.

1. Where the agent for the sale of land without the knowledge of his principal procures a third person to agree to assist in the sale for a portion of the commissions, such third person cannot himself purchase the land and turn it over to another at an advanced price.

SPECIFIC PERFORMANCE—EVIDENCE OF CONTRACT—SUFFICIENCY.

2. Evidence in an action for specific performance of a contract for the sale of land held to show, that plaintiff was employed as a subagent by defendant's agent to make a sale for a portion of the commission, so that he could not buy himself for immediate resale at a profit.

From Lane: LAWRENCE T. HARRIS, Judge.

This is a suit for specific performance by H. H. Fisk against Anderson Waite, Emma Waite, and the First National Bank of Eugene. From a decree in favor of defendants, plaintiff appeals.          AFFIRMED.

For appellant there was a brief over the names of *Mr. Rufus A. Leiter, Mr. John M. Pipes, Mr. George A. Pipes,* and *Messrs. Woodcock & Potter,* with oral arguments by *Mr. Leiter* and *Mr. Edwin O. Potter.*

For respondents there was a brief over the names of *Messrs. Williams & Bean,* and an oral argument by *Mr. John M. Williams.*

Opinion by MR. CHIEF JUSTICE MOORE.

This is a suit to enforce the specific performance of a contract to convey real property. The facts are that the defendant Anderson Waite, being the owner of 320 acres of land in Lane County, on October 2, 1905, by a writing, appointed E. T. Maher to sell the property, and stipulated that, if he secured a purchaser who would pay $10 an acre for the premises, a commission of 10 per cent would be given for that service. Maher on October 20, 1906, executed to the plaintiff, H. H. Fisk, a written option to purchase the land within 30 days for $3,200, of which sum $300 was to be paid when the

election was exercised, and the remainder on or before March 1, 1907. Maher thereupon notified Waite that he thought he had effected a sale of the property at the price and upon the terms stated, and requested that a deed should be made to Fisk and sent to the defendant, the First National Bank of Eugene, to be delivered to the purchaser upon payment of the consideration, which order was obeyed. Fisk on November 20, 1906, accepted the property and left with the bank $300 for Waite, who soon thereafter notified the bank not to receive any money on account of the land, and that, if any payment thereon had been made, to return it. Within the time limited Fisk tendered the bank $2,900, and demanded the delivery of the deed, but, failing to obtain it, commenced this suit, alleging the facts, in substance, as hereinbefore stated.

The answer denies the material averments of the complaint and alleges, *inter alia,* that Maher entered into an agreement with the plaintiff whereby the latter was to assist him in securing a purchaser of the premises, for which service Fisk was to receive a part of the stipulated commission; that Waite had no knowledge of such contract when he made the deed; that the plaintiff accepted the employment, and thereby became Waite's agent for the sale of the land; that the premises are reasonably worth $20 an acre, which value the plaintiff and Maher well knew, but Waite was ignorant thereof; that Maher, taking advantage of such lack of knowledge, fraudulently entered into an agreement with the plaintiff to defraud Waite, and, pursuant to such scheme, Maher pretended that he had procured the plaintiff as a purchaser at $10 an acre, and falsely represented to Waite that such sum was the highest price obtainable; that Waite, relying on such statements, signed and acknowledged the deed as directed, but before it was delivered, discovered the fraud which was attempted to be perpetrated upon him, and immediately rescinded the contract.

The reply put in issue the allegations of new matter in the answer, and, the cause being tried, the suit was dismissed, and the plaintiff appeals.

1. It is maintained that the plaintiff was a purchaser of the land in good faith, and that the transaction is not invalidated by the fact that he was to receive a part of the commission to be paid for consummating the sale, and that an error was committed in dismissing the suit. The testimony shows that when Maher was appointed to sell the land, Waite was living in Massachusetts, though several years prior thereto he had resided on the premises. The land is chiefly valuable for its timber, the quality and estimated quantity of which Waite knew, but the worth of the land, as determined by the demand for the timber thereon, he did not comprehend. Maher soon after his appointment tried to sell the property, and on May 8, 1906, was offered therefor $2,200; but Waite, upon being informed thereof, declined the bid, stipulating, however, that, if an immediate sale could be made, he would accept $2,520 in excess of the commission, which, with that sum, made the price of the land $2,800. At the time the plaintiff secured the option to purchase the premises, Maher's partner in the real estate business was a Mr. Weatherson. Maher, as a witness for the plaintiff, testified on cross-examination, as follows:

"Q. Didn't you employ Fisk to help you sell the land?

"A. No, sir; I hope I may never—

"Q. Didn't you agree to give Fisk one-third of the commission?

"A. I did after Fisk had set there and talked to me that evening. He says: 'If I sell the land for you, Ed, how much will you give me?' and Weatherson says: 'Ed, give him half.' 'No,' I says, 'I won't. I will give him one-third.' * *

"Q. Mr. Fisk brought a young man by the name of Mahaffy to you, didn't he?

"A. I didn't know the young man's name then. He had a young man there at the house.

"Q. That was before you entered into the agreement?

"A. No, sir; right there at that time.

"Q. At the same time?

"A. Right there at that time.

"Q. And Mr. Mahaffy talked to you about the land?

"A. Mr. Mahaffy—if that's his name—asked what we wanted for the land, and I told him $10. 'Well,' he says, 'that's too much for the land.' He says: 'People's holding land up too high.' I says: 'I know. I tried all summer to sell the land for $2,800, but I couldn't get it; but there might be prospects of getting more after a while.' I says: 'If you want it for $3,200, you can have it, and, if you don't, I can go.' And I took my hat and started away. They set there and talked a while and said they would give it. * *

"Q. Where did this conversation occur?

"A. In Mapleton.

"Q. Where was the contract made out?

"A. At Mapleton, in Mr. H. H. Fisk's house.

"Q. Who made it out?

"A. That young man that was with him—under Mr. Fisk's orders and mine. I told him how to make it out.

"Q. Mr. Mahaffy told you how to make it out?

"A. No, sir; I told him. He wrote it. He wanted me to give him 60 days' time, and I told him he couldn't have but 30. * *

"Q. Mr. Mahaffy inquired particularly about the land, didn't he?

"A. Mr. Mahaffy told me he might accidentally find a purchaser for the land, if I would give him time to cruise it, and he says, 'I would like 60 days'; and I says, 'You can have 20 days and no longer.'"

Maher, having testified that the agreement to pay the plaintiff one-third of the commission was entered into after the option was executed, was asked:

"That was to give to Mr. Fisk as compensation for selling the land?"

To this he replied:

"I gave it to Mr. Fisk as compensation for selling the land."

The plaintiff, as a witness in his own behalf, was asked and gave answers on cross-examination, as follows:

"Q. Who drew the check (referring to the tender of $2,900)?

"A. I think I drew the check myself.

"Q. Who signed it?

"A. I think I signed it; but I would not be positive now. I was handling checks of Mr. Mahaffy's and more or less of my own checks, and I can't say.

"Q. Now, isn't it a fact that at that time you were buying timber for Laswell and Mahaffy?

"A. I wasn't buying for Mr. Laswell at all.

"Q. You were buying for Mahaffy?

"A. I had bought some for Mahaffy.

"Q. Were you still buying some for him?

"A. You might say I was. I expected to turn over some other lands to him.

"Q. You were buying this land in dispute for him?

"A. Not necessarily. * *

"Q. Now, isn't it a fact that this certified check that you speak of (meaning the tender of $2,900) was a certified check drawn by Mr. Mahaffy?

"A. Might have been. I couldn't say. * *"

The defendant's counsel, referring to the one-third of the commissions which Maher had agreed to pay Fisk, inquired of the latter: "Was that all the compensation you were to get?" to which the witness replied:

"On that deal; yes.

"Q. Now was that all you were getting in the whole deal—getting the option and turning the lands over to Mahaffy?

"A. No, sir; it is not.

"Q. You were turning them over to him at a profit, weren't you?

"A. Well, at a reasonable profit; yes."

After Maher had executed the option to Fisk, he wrote to Waite, saying: "I have made this contract with the parties." Waite, having returned to this State to attend the trial of this cause, testified that in his opinion the

value of the land referred to was $20 an acre. Another witness, however, estimates the worth of the property to be $12.50 or $15 an acre. Fisk did not testify that · he was purchasing Waite's land for himself; and we think it is fairly inferable from the testimony hereinbefore set forth that he was trying to secure it for Mahaffy. In *Scott* v. *Lloyd,* 19 Colo. 401 (35 Pac. 733), which was an action to recover the sum of $150 as a commission agreed to be paid for negotiating the sale of land, a conveyance of which had been made, the defense interposed was that the plaintiff had agreed to divide his commission with the purchaser. A judgment for the defendant was rendered in the lower court, but reversed on appeal, and it was held that the rule requiring good faith and fair dealing on the part of an agent toward his principal, which would not permit him to assume a double capacity whereby his interest might conflict with the rights of his principal, is not violated by the agent's agreement to forego a part of his commission in order to effect a sale.

2. The rule there announced is invoked by plaintiff's counsel as controlling in the case at bar, but we do not consider it applicable because the plaintiff is not, in our opinion, the purchaser of the land in good faith. The plaintiff's counsel also rely upon the case of *Collar* v. *Ford,* 45 Iowa, 331, 336, in which it was held that, pursuant to request, the ascertaining and reporting by a person of the amount of taxes imposed upon the land of an absent owner, did not constitute an agency between such person and the owner in respect to that land, so as to charge that person with fraud in buying the premises for less than their value. In deciding that case, Mr. Justice ADAMS makes use of the following language: "While an agent employed to sell the property of his principal is charged with the duty of obtaining the highest price he can fairly get, yet if he himself becomes the purchaser, and the principal the seller, he is under no

obligation to assist the principal to obtain the highest price he can. The moment he becomes the buyer and the principal the seller, the agency in relation to the property ceases. The parties deal with each other, as it were, at arm's length. This is necessarily so. It being the buyer's right to buy the property for the least he can, he cannot be charged with the duty of aiding the seller to obtain the most he can." No authority is cited in support of such doctrine, which was practically repudiated in the case of *Green* v. *Peeso,* 92 Iowa, 261, 266 (60 N. W. 531), where it was held that when an agent proposed to become a purchaser of his principal's land, and thus placed himself in a position whereby his judgment might be biased by his interest, it was incumbent upon him to furnish exact and truthful information as to the value of the premises. In rendering that decision it is said: "The case of *Collar* v. *Ford,* 45 Iowa, 331, is not in conflict with the rule here announced. In that case, while defendant was plaintiff's agent, yet he was simply empowered to ascertain and report the amount necessary to redeem the land sold from tax sale. He had no authority to act as agent in the sale of the land, and was under no obligation to report as to the value of the land, or to procure a purchaser for it. The defendant in that case did nothing to deceive, and omitted nothing which of right he ought to have done; and while some of the language in the opinion is broad enough to cover the principle involved in this case, and sustain the conveyance, yet, when applied to the facts of that particular case, the rule adopted is not in conflict with the one here announced." The authority of an agent to appoint a sub-agent, to aid in executing the power committed by the principal, is often implied by the nature of the business which is required to be transacted. 1 Am. & Eng. Enc. Law (2 ed), 981. Thus, as was said in *Morgenstern* v. *Hill,* 8 Misc. Rep. 356, 358 (28 N. Y. Supp. 704, 705) : "There is no reason why an agent for the sale of lands, such as

the defendant seems to have been, should not employ agents himself in and about the business of the agency." In the case at bar, as the plaintiff is not the equitable purchaser of the land, the agreement which he entered into with Maher, whereby he was to receive a part of the commission in case he effected a sale of the premises, made him Waite's agent, and without a full disclosure of his interests therein, precluded him from acquiring title to the real property. 1 Am. & Eng. Enc. Law (2 ed.), 1075; *Tyler* v. *Sanborn,* 128 Ill. 136 (21 N. E. 193: 4 L. R. A. 218: 15 Am. Rep. 97); *Jansen* v. *Williams,* 36 Neb. 869 (55 N. W. 279: 20 L. R. A. 207). Thus, where a person, intrusted with the sale of real estate, purchases it himself through other parties, the vendor may rescind the sale, though the price paid is all that was demanded by the owner of the land. *Rich* v. *Black,* 173 Pa. 92 (33 Atl. 880); *Tilleny* v. *Wolverton,* 46 Minn. 256 (48 N. W. 908).

The plaintiff's agreement to accept a part of the commission for finding a purchaser of the land, prevented him from consummating a sale thereof in the manner attempted; and, this being so, no error was committed in dismissing the suit.

It follows that the decree is affirmed.

AFFIRMED.

---

Decided February 2, 1909.