Elizabeth Sager, Orren C. Allen and Ezra T. Hazeltine, Trustees of the Estate of George A. Cobham, Deceased, *v.* George Mead.

[Marked to be reported.]

*Ejectment—Orphans' court sale—Laches.*

An orphans' court sale for the payment of decedent's debts having been adjudged necessary by the court making the order of sale, and being regular and bona fide, will not be set aside in an action of ejectment after a delay of sixteen years, when there is nothing more to defeat the sale than some conflicting and inconclusive testimony that the sale was not necessary because there were sufficient personal assets in the hands of the administrator to pay all the debts, and that the price which the land brought at the sale was less than its actual value.

An orphans' court sale for the payment of debts will not be set aside where the family entered into an agreement that the land should be sold and bought in by them, and where the plaintiff was a party to all the proceedings sought to be invalidated, and where she still continues to hold all the benefits which came to her out of the proceedings. She will be bound by the proceedings if they were bona fide, and she will not be permitted to assert her own fraud to attack them if they were fraudulent.

Argued May 9, 1895.   Appeal, No. 371, Jan. T., 1895, by plaintiffs, from judgment of C. P. Warren Co., Sept. T., 1891, No. 57, on verdict for defendant.   Before Sterrett, C. J., Green, Williams, McCollum and Fell, JJ.   Affirmed.

Ejectment for a tract of two hundred and seventy acres of land in Glade township.

At the trial the court directed the jury to return a verdict in favor of defendant.

MAYER, P. J., of the 25th district, specially presiding, subsequently filed the following opinion, by which and by the opinion of the Supreme Court, the facts appear:

After the evidence was closed and the arguments of counsel made, the court directed a verdict for the defendant, and we now put on record our reasons for such direction.

This was an action of ejectment brought to recover possession of two hundred and seventy-five acres of land situate in the township of Glade, in the county of Warren. The land in controversy is a part of what was known as Cobham park. Both the parties to the suit claimed title under George Ashworth Cobham, in whom the legal title was vested at the time of his decease.

To arrive at a clear and intelligent understanding of the ground upon which the action of the court was based, it will be necessary to give a full history of the case. George Ashworth Cobham died October 6, 1870, leaving a last will and testament, dated September 28, 1870.. On December 9, 1870, this will was produced before the register for probate, but objections were made to its probate by Elizabeth Sager, John Sager and Alice Mead, heirs at law of the said testator, and a caveat was filed, and a request for an issue to be framed on the facts alleged in the caveat, and for a precept to issue to the court of common pleas for the trial of the same.

On the 17th day of April, 1871, the precept was issued and an issue directed. On the 19th day of May, 1871, S. P. Johnson, Esq., attorney for the heirs and devisees of George A. Cobham, deceased, discontinued the issue, and withdrew the will and all the papers from the record and the will from probate. On the 16th day of June, 1871, Georgena C. Cobham, Elizabeth Sager, her husband, John Sager, Alice Mead, her husband, George Mead, and Henry Cobham, heirs at law of the testator, George Ashworth Cobham, filed a renunciation of their right to administer on the estate of the said testator, and requested that letters of administrator be issued to Rufus B. Smith, to whom letters of administration were issued on the 16th day of

June, 1871. On the petition of Elizabeth Sager, John Sager and Alice Mead to the orphans' court of Warren county, the letters of administration to Smith were revoked by the court. On June 18, 1871, an agreement was entered into between Elizabeth Sager, John Sager, her husband, Georgena C. Cobham, Alice Mead and George Mead, her husband, heirs at law of the said George A. Cobham, deceased, of the one part, and Henry Cobham, nephew and stepson of the deceased, of the other part, which provided that the application for the probate of the last will and testament of the said George A. Cobham, deceased, should be withdrawn. That William M. Lindsay should take out letters of administration on said estate and dispose of the property for the payment of the debts of the decedent. That the property should be purchased by George N. Parmlee, and held by him for redemption by and distribution to and among the parties to said agreement according to their rights and equities in the same, as if the said George A. Cobham had died intestate.

The agreement further provided that to settle all disputes and differences between the parties thereto respecting their rights and equities in the said estate, they agree to submit the entire question of their rights and equities, distribution and partition of both the personal and real estate of said decedent to the arbitrament and final award and distribution of S. P. Johnson, W. D. Brown and E. B. Eldred, or a majority of them, whose award and distribution was to be final and conclusive forever, waiving all right of appeal or exception thereto.

On the 10th day of October, 1871, letters of administration de bonis non were granted to W. M. Lindsay.

On the 13th day of December, 1871, W. M. Lindsay petitioned the orphans' court of Warren county for leave to sell the real estate for the payment of debts. On the same day the court made an order and decree authorizing the administrator to sell the real estate described in the petition towards the payment of the debts, and prescribed the terms of sale. On March 6, 1872, W. M. Lindsay made return setting forth that on February 24, 1872, he sold the lands described in the petition to George N. Parmlee for the aggregate sum of $4,275, Parmlee being the highest and best bidder, and on the same day the sale was confirmed by the court in the usual form.

Three years afterwards, on April 10, 1875, the will of George
A. Cobham was admitted to probate, but no trustees or exec-
utors were appointed or qualified to execute its provisions.   On
the 9th day of July, 1875, W. M. Lindsay filed his account as
administrator of said estate, in which he charges himself with
the amount of personal property which came into his hands
belonging to said estate, and the proceeds of sale of said real
estate.   On the 2d day of October, 1878, no exceptions having
been filed, the account was confirmed absolutely by the orphans'
court of Warren county.

Under the agreement of June 18, 1871, the land purchased
by George N. Parmlee at orphans' court sale was on the 30th
day of October, 1872, partitioned to and among the parties to
said agreement, and deeds were made by said Parmlee to the
respective parties, and possession was taken by them of the
lands allotted and conveyed to them.   Elizabeth Sager received
a deed for her purpart, entered into possession and has continued
in possession ever since, and nothing was done to challenge the
regularity or validity of the proceedings in the orphans' court,
or question the title acquired under them, until August 7, 1891,
when the ejectment in this case was instituted at the instance
of Elizabeth Sager, after the parties had been in possession of
their respective purparts for almost nineteen years.

This ejectment was brought under the following circum-
stances: On the 27th day of May, 1889, Elizabeth Sager pre-
sented her petition to the court of common pleas of Warren
county, in which she avers, "That George A. Cobham, of
Glade township, Warren county, died on the 6th day of Octo-
ber, A. D., 1870, having made his last will and testament, duly
proved on the 10th day of April, 1875.   The said George A.
Cobham left an estate in Warren county, Pennsylvania, and
the estate known as the Fearns and Tunstead estates situate
in Rossindale, county of Lancaster, and kingdom of England,
and the said George A. Cobham appointed Henry Cobham and
Georgena Catharine Cobham and Rasselas Brown, all of War-
ren county, Pennsylvania, and John Cobham, of Liverpool,
England, trustees under the said will, and whereas Georgena
Catharine Cobham died August 7, 1882, and John Cobham, of
Liverpool, England, died January 10, 1889, and Henry Cob-
ham and Rasselas Brown had filed their renunciation as trus-

tees under the said will of George A. Cobham, and refused to act, which makes a vacancy of all the trustees under the said will. The above named English property was put in the court of chancery and a receiver appointed, and the said receiver has quite a large amount of your petitioner's money in his hands and he declines to part with it and pay your. petitioner until the trustees are appointed under the will of George A. Cobham so that he can get a proper receipt for the same; now your petitioner respectfully wants this court to appoint trustees under the will of her late father, George A. Cobham, to fill the vacancy, so that your petitioner will be able to get her money, and any other facts of equity and justice as the case may demand."

On the 27th day of May, 1889, a rule was granted to show cause why trustees should not be appointed.

The case was referred to a master, who recommended the dismissal of the rule, but on exceptions filed to the master's report, Hon. FRANK GUNNISON, president judge of the sixth judicial district, sustained them in an opinion filed, and appointed the plaintiffs in this action of ejectment trustees under said will. The sole purpose of appointing said trustees was, as set forth in the petition of Elizabeth Sager, and the opinion of Judge GUNNISON, to have some person authorized to receive and receipt for the moneys coming to the estate of George A. Cobham from the properties in England.

On the former trial of this case before Hon. A. G. OLMSTED, president judge of the forty-eighth judicial district, the plaintiff made the following offer of evidence: "Plaintiffs offered in evidence the agreement, signed by Georgena C. Cobham, Elizabeth Sager, John Sager, Alice Mead, George Mead and Henry Cobham, dated June 18th, 1871, and identified by the witness, James O. Parmlee, Esq., to be followed by evidence that the will of George A. Cobham was withdrawn from probate; that letters of administration upon his estate were granted to W. M. Lindsay; that said administrator obtained from the court an order of sale of the real estate of the decedent, George A. Cobham, without exhibiting to the court a schedule of the debts of the decedent; that the real estate of said decedent, consisting of several parcels, was sold as one body of land to George N. Parmlee, the person named in the agreement; that said Parmlee paid no money for said land to

the administrator; that the said George N. Parmlee made deeds for different parcels of said land to different parties to said agreement, receiving no money from either of them.   This evidence being for the purpose of showing that the administrators' sale, under which defendant claims title, was a fraud upon the other beneficiaries beside the parties to the agreement under the will of the testator, George A. Cobham, and void as to them.   Also to prove that defendant knew of the will and who the trustees and executors under it were."

Defendant objected to the offer, "except so much as goes to prove that W. M. Lindsay was appointed administrator, and that in the course of his duties as administrator, he applied to the orphans' court of Warren county for leave to sell the land in controversy, made sale thereof, the return approved by the court and deed made in pursuance thereof."

The court sustained the objections, excluded the evidence, and on appeal to the Supreme Court this ruling of Judge OLM-STED was reversed, the Supreme Court deciding that this proposed evidence should have been admitted and submitted to the jury with guarded instructions as to its legal effect.

Following the decision of the Supreme Court, we admitted, on the present trial, the evidence proposed to be offered on the trial before Judge OLMSTED, but in our judgment the evidence when introduced failed to establish fraud or collusion, or show that any effort was made to depreciate the price of the property at the time of the sale.   The decided weight of the evidence was, that the real estate sold by the administrator brought all that it was fairly worth.

But aside from this question of fraud, which it is claimed invalidated the orphans' court sale, we are of the opinion that the present plaintiffs are not in a position to maintain this ejectment.   The will of George A. Cobham provides as follows: "Now I, the said George Ashworth Cobham, do hereby give, devise and bequeath unto my son the said Henry Cobham, to my daughter Georgena Catherine Cobham, John Cobham, of Liverpool, aforesaid, and Rasselas Brown, of Warren, aforesaid, Counsellor at Law, all my money invested in United States bonds, and all my dwelling houses, barns, lands, hereditaments and premises, known by the name of Cobham Park, situate in Warren County, Pennsylvania, and all other messu

ages or dwelling houses, and other property, real, personal or mixed, situate in the United States of America, together with all those certain messuages, barns, lands and premises, known as the Fearnes and Tunstead·estates, situate in Rossindale, in the County of Lancaster and Kingdom of England, particularly described in the second schedule annexed to the before-named settlement, and to their heirs and assigns, and hereby appoint them my executors upon the trusts, interests and purposes after-mentioned, that is to say."

Our construction of this will is, that the trusts to be executed under it are annexed to the office of executor, and that the executors are amenable to the orphans' court for the due execution of them, and subject to its orders and decrees on the petition of any one interested in said estate. The testator, after devising and bequeathing all his estate, both real and personal, to his son Henry Cobham, his daughter Georgena Catharine Cobham, John Cobham and Rasselas Brown, their heirs and assigns, appoints them his executors "*upon* the trusts, interests and purposes aftermentioned;" then follow all the trusts which are to be executed under the will. To our mind, the intention of the testator is clearly disclosed in his will; that the trusts enumerated therein were not distinct and collateral trusts, which might be exercised independently of the executorship, but were conferred on the executors as such or virtute officii, and were to be executed by them as executors.

If we are correct in our conclusion that the trusts contained in the will of George A. Cobham are annexed to the office of executor, the orphans' court of Warren county had exclusive jurisdiction over said trusts, and the appointment by the court of common pleas of Warren county of the plaintiffs in this ejectment as trustees under said will was without jurisdiction and void, and they cannot maintain this action of ejectment.

The fifteenth section of the act of the 14th of June, 1836, provides that when a trust of either real or personal estate has been created by deed, will or otherwise, for the use or benefit of any person, the court of common pleas of the county in which the trustee has resided shall exercise the jurisdiction and power given by law in regard to such trust; provided that nothing therein contained shall extend to trusts created by will and

vested in executors or administrators, either by words of the will, or by provisions or operations of law, wherever such executors or administrators by the existing laws are amenable to the orphans' court.

A trustee appointed by will is amenable to the jurisdiction of the court of common pleas, unless it appear that the trust is annexed to the office of executor, quasi executor or ratione officii, in which case the orphans' court alone has jurisdiction : Case of Elizabeth Baird, 1 W. & S. 288.

In Innes's Estate, 4 Wharton, 179, it was held that since the enactment of the act of June 14th, 1836, the courts of common pleas have no jurisdiction over trusts created by will and vested in executors or administrators, whenever such executors or administrators are amenable to the orphans' court.

The relative powers of the courts of common pleas and orphans' court to appoint testamentary trustees were fully discussed by the Supreme Court in Wapples' Appeal, 74 Pa. 104. We quote from the opinion : " In Wheatly v. Badger, 7 Barr, 459, it was held, that where the will constitutes the executor a trustee, by name, and not virtute officii, the orphans' court had no jurisdiction over the trust. But in Brown's Appeal, 2 Jones, 333, that decision was overruled, and it was held, that although the trustees are appointed by nomination, yet the orphans' court had concurrent jurisdiction with the common pleas in cases of testamentary trusts; that the object of the statute of 14th June, 1836, was to give power to the common pleas, and not to take it from the orphans' court. It gives to the common pleas concurrent jurisdiction, except in cases where, by the proviso, jurisdiction is saved exclusively to the orphans' court: Seibert's Appeal, 7 Harris, 53. Where the testamentary trust is given to the executors virtute officii, jurisdiction is exclusively in the orphans' court: Innes' Estate, supra; Brown's Appeal, supra; Seibert's Appeal, supra."

Having determined that the trusts created by the will of George A. Cobham were annexed to the office of executor, and as two of the executors named in the will have died, and the other two have renounced or refused to act, the trust must be exercised by an administrator de bonis non.

Where a testamentary trust is vested in executors virtute officii, in case of a vacancy their powers and duties devolve

upon the administrator de bonis non.  But where the trust is a distinct and collateral one, and can be exercised independently of the executorship, the court must appoint a successor: Rhone's Orphans' Court Practice, vol. 2, par. 1260 ; Olwine's Appeal, 4 W. & S. 492 ; Ebert's Appeal, 9 Watts, 300.

The Supreme Court having decided in Sager v. Mead that the appointment by the register of W. M. Lindsay as administrator de bonis was regular, he would have had authority to execute the trust contained in the will of the testator, had not the estate been sold in payment of the debts of the testator.

Was Elizabeth Sager in a position to assail the orphans' court proceedings on the ground of fraud.  She was a party to all the proceedings from the time the will was offered for probate, until she received a deed for her purpart under the agreement of July 18, 1871.  She went into possession of her property, has continued in possession, reaping the fruits of her fraud, in the reception of the proceeds of the farm allotted to her. Surely she could not maintain this action of ejectment as she was a party to the fraudulent contract, and the maxim, Nemo allegans suam turpitudinem est audiendus, is applicable in her case.  Nor can she, by procuring the appointment of trustees of whom she is one, indirectly accomplish what she could not do directly.

There is a class of cases, where the parties to a fraudulent or even an illegal contract have fully executed it themselves, in which courts of justice will not interfere to unravel their doings: Miller's Appeal, 6 Casey, 478 ; Blystone v. Blystone, 1 P. F. S. 373 ; Gill v. Henry, 95 Pa. 388.  Under the guise of having trustees appointed to receive the moneys coming from the properties in England she is abusing the power conferred for another and ulterior purpose of her own, which a court of justice should not and will not sanction.  A careful consideration of this case has only strengthened the conclusion at which we.arrived on the trial that the present plaintiffs are not entitled to recover the land in controversy.  In our opinion the verdict was properly directed for the defendant.

Judgment was entered for defendant on the verdict.  Plaintiff appealed.

*Error assigned* was above instruction.

*D. I. Ball, Allen & Sons* with him, for appellants.—The court below erred in not submitting this case to the jury upon the question of fraud.

An instrument intended and used for the purposes of prejudicing the rights of another is void as against the rights of the party intended to be injured by it: Bunn, Reignel & Co. v. Ahl, 29 Pa. 387 ; Jackson v. Summerville, 13 Pa. 359; Gilbert v. Hoffman, 2 Watts, 66.

Where the testator appoints a person by name to execute a trust created by his will, and then makes the same person executor also, the trust is not annexed to his office as executor, and the jurisdiction belongs to the common pleas : Jones' App., 3 Grant, 169 ; Bayard's Case, 1 W. & S. 92 ; Barnitz's App., 9 Watts, 300 ; Johnson's App., 9 Pa. 416 ; Wheatley v. Badger, 7 Pa. 459.

*M. F. Elliott, H. McSweeny, Wilbur & Schnur* and *Hinckley & Rice* with him, for appellee.—That part of the agreement which provided that Mr. Parmlee should purchase the property for the heirs at the administrator's sale, and that the same should be divided between them in the manner provided for in said contract, was not fraudulent: Young v. Snyder, 3 Grant, 151 ; Smull v. Jones, 6 Watts & S. 122; Nat. Bark of the Metrop. v. Sprague, 20 N. J. Eq. 160.

OPINION BY MR. JUSTICE GREEN, October 7, 1895 :

The land for which the present action of ejectment is brought was part of a large body of land containing in the whole about a thousand acres. According to the testimony of all the witnesses on both sides, the great bulk of it was wild land, quite hilly, steep and rocky on the river side, most of the timber cut off in 1872, and according to the testimony of the plaintiffs having about one hundred and fifty to two hundred acres of cleared land, but according to the testimony of the defendant having at the time only about one hundred acres of cleared land, about sixty acres of which was in a good state of cultivation. There was a large frame dwelling house upon it and quite a large barn. Two witnesses for the plaintiffs, Brassington and Shaler, testified that they thought the whole property, improvements and all, was worth from $15.00 to $20.00 per acre

in 1872. Another witness, Lauffenberger, said he thought the wild land was worth $10.00 an acre, but gave no estimate as to the cleared land and improvements.

The only remaining witness for the plaintiffs, Sweeting, said he thought the cleared land including the improvements would be worth not less than $7,000 to $8,000, and with some reluctance said he thought the wild land was worth about $20.00 an acre.

On the part of the defendant one witness, Irvine, a farmer who had known the property for over fifty years, testified that in 1872 it contained about one hundred acres of cleared land, of which about fifty acres were fit for cultivation, the other forty being plowed over and grown up to briars and sprouts. He said he would not consider the whole property worth over $3,500 to $4,000, and gave his reasons for it. Another witness, Wetmore, who had known the property for many years, and whose business was farming and lumbering, said the cleared land was in a poor state of cultivation, that the wild land was very hilly, part of it barren, and that the value of the entire property was not over $4.00 an acre. Another witness, Mowris, who had lived in the township since 1865 and had known the property from about fifteen years before George A. Cobham's death, said about one hundred acres were under cultivation, not good cultivation however, that the wild land was rough, and hilly, and rocky, and that he considered the entire property was not worth more than from $4.00 to $5.00 an acre. Another witness, Walters, who had known the property for forty years, said all the choice timber had been cut off before Cobham's death, that not more than one hundred acres was cleared, and only sixty acres of that was so it could be plowed, and that was partly stumps and stones, and that the value of the whole property in 1872 was not more than $4.00 per acre. Another witness, Eldred, said the cleared land was much grown up with brush, that the most of the wild land was hill land, and that he did not consider it worth anything in 1872 with the timber off, and that he would not have been willing to give $5.00 an acre for the whole property at that time. Another witness, Smith, testified that he had purchased and removed all the pine timber, about four hundred acres, before Cobham's death, and that another man named Ballard had pur-

chased and cut all the oak.  He said also that practically all
the valuable timber had been cut off before Cobham's death,
and that the small and inferior timber that was left was of very
trifling value.

This being the condition of the property a petition was pre-
sented to the orphans' court for an order to sell it for the pay
ment of debts of the decedent, by the administrator de bonis
non, on December 13, 1871.  The order was granted the same
day and on March 6, 1872, the administrator returned to the
court that he had sold the land to George N. Parmlee for the
aggregate sum of $4,275, he being the highest and best bidder,
upon the terms set forth in the order.  The petition set forth
"that the available personal assets of the decedent that has
come to the hands and knowledge of your petitioner are en-
tirely insufficient to pay the debts owing by said estate, as
appears by the accounts and claims duly authenticated and
filed with him."  That the whole amount of personal property
after deducting the exemption claimed and retained by the
children was $921, and the debts presented and filed with the
petitioner amounted to $5,124.64, leaving a balance over and
above the assets of $4,203.64 besides interest and costs of ad-
ministration.  When this case was here before we held this
petition and proceeding to be a sufficient compliance with the
law : 164 Pa. 131.  An agreement had been made by all the
parties then interested in the estate to withdraw from the reg-
ister the application for the probate of the will, that Wm. M.
Lindsay should take out letters of administration on the estate
of the deceased and dispose of the estate for the payment of
debts, that George N. Parmlee should purchase the property
at the sale and should hold it for redemption and distribution
to and among the parties according to their original rights and
equities in the same way as if the deceased had died intestate.
For the purpose of settling all disputes and differences the
whole question of distribution was referred to the final arbitra-
ment of three selected gentlemen of reputation and integrity,
whose action should be binding and conclusive upon all the
parties, and that they should furnish the money necessary to
extinguish the indebtedness of the decedent.  There were some
other details of the agreement not important to mention.  As
a matter of course this agreement and all the proceedings were

prepared and conducted under legal advice, the gentleman who acted for the parties in the premises being one of the most distinguished and honorable lawyers of the commonwealth. It will be perceived at once that the foundation of the whole adjustment was the sale for the payment of debts. If that was legal all title under the will would be divested.

The facts being that the personal estate was insufficient for the payment of debts, there was no legal difficulty in the way of selling the property under an order of sale out of the orphans' court, and that course was adopted manifestly because it was a clearly legitimate and proper way in which to divest the title of claimants under the will. It is simply impossible to say that there was any fraud either in the conception or execution of such a plan of procedure. If a sale was necessary for the payment of debts the estate could not be settled without doing that very thing, and the mere doing of it is not the slightest evidence of fraud. Hence the chief inquiry in the case is, was the proceeding in the orphans' court for the sale of the property for the payment of the debts of the decedent a valid proceeding. On its face it most assuredly was. The necessary facts to give the court jurisdiction to grant the order appear on the record, and the proceeding was most strictly regular and correct in every respect. It was followed by an account subsequently filed by the administrator, which shows how the entire estate was disposed of. The accountant charged himself with the whole of the personal estate as contained in the inventory, and which came to him thereafter, and with the whole proceeds of the real estate sold, the total amount being $5,922.11. Taking credit for the goods and chattels retained by the heirs, $1,070.70, and the cash paid them, $738.43, and for the various debts and expenses paid, there was a balance due the accountant of $21.05. This account was filed on July 9, 1878. So far as any testimony in this case is concerned no exceptions were ever filed to it, nor was any question ever raised as to its correctness. Under the law it was duly confirmed in regular course during the year 1878, and has remained unimpeached from that time to the time of this trial, a period of about sixteen years. All the parties in interest, including Elizabeth Sager, one of the present plaintiffs, had the opportunity of attacking the sale but they never did. The question which now arises is, was the sale

of that real estate a valid sale. If it was the plaintiffs have no case.

A very weak and feeble attempt was made on the trial to impeach its validity. A little evidence was given, the purpose of which was to show that there was some personal property more than appeared in the inventory. If the testimony rendered that fact clear, and yet the additional property was not sufficient to yield money enough to pay the debts with, it could not invalidate the sale. But the evidence did not establish the fact. It was said there was some hay not accounted for, but the proof did not support the assertion, nor did it specify the quantity of the hay, nor its value, nor whether it really belonged to the decedent. Mrs. Sager's husband said he told Mr. Lindsay, the administrator, that one Curtis had one hundred head of sheep that he took from the deceased on shares, that the sheep mostly all died and that Mr. Cobham had said Curtis should pay him $400, that Lindsay said Curtis had paid him, without stating any amount. Mr. Lindsay testified that he had collected $100 from Curtis and it was charged in the account. Sager also said he told Lindsay that one Laufenberger owed money to the estate. Lindsay testified that he had settled that matter and it was charged in the account. Sager also said he told Lindsay there was $5,000 or $6,000 worth of personal property, and Lindsay says he never told him anything of the kind, or anything else about the amount of personal property on the premises. It is upon such flimsy and worthless testimony as this that it is now asked to invalidate an orphans' court sale of real estate sixteen years after it was finally confirmed, when the very witness and his wife and all the other parties acquiesced in it during all that time, and never sought to surcharge the administrator when his account was filed, or at any time after. Of course the attempt is preposterous.

Then it was sought to prove that the sale was invalid because the real estate was worth much more than the price at which it was sold. Such a reason would be of no account if it were true, if the sale was properly conducted, although the effort to set the sale aside had been made immediately after the sale. But after sixteen years of acquiescence, and after the title had passed under the sale for that length of time, the proposition to declare it invalid for such a reason is ridiculous. There is however a

still more conclusive reason against it, and that is that the proof does not establish the fact. A large preponderance of the testimony proves that the property brought all it was worth, and it is no answer to say that the jury should have determined this. The question is, shall a deed made and delivered under, and in pursuance of, an order of sale granted by an orphans' court, under which possession has been taken, purchase money paid and title unquestioned for sixteen years, be set aside and avoided, because three selected witnesses say that in their opinion the property was worth more than the price at which it was sold, when six witnesses say it brought all it was worth. There can be but one answer to such a question. No trial judge could permit a verdict setting aside such a deed upon such testimony to stand. It would be his duty, sitting as a chancellor, to pronounce the evidence insufficient for such a purpose, and therefore as a trial judge to give a binding instruction to the jury. This is what the learned judge of the common pleas did with eminent propriety and correctness.

As to the general charge of fraud in the whole transaction there was absolutely no evidence to support it. If the sale of the property for the payment of debts was necessary, it was entirely competent for the parties interested in the estate to furnish the money for the payment of the debts, and to take deeds for it in severalty. The necessity for the sale was adjudged by the court which granted the order, and if the present plaintiff Elizabeth Sager, or any of the other persons interested desired to question its validity then was the time to do it. If, having the opportunity to do so, as they all had, they acquiesced in the sale, and stood by and permitted title to be taken, a division of the property into several parcels to be made, and an acceptance of title by each distributee of the parcel allotted, and possession to be taken and maintained for sixteen years, such persons cannot now call in question such a title. Another reason especially applicable to Elizabeth Sager is that she was herself, together with her husband, a party to the original agreement and has accepted an allotment of the land according to its terms, and is at this time enjoying the full benefit of its provisions. It would be a scandal upon the administration of justice to permit a person so circumstanced to impugn successfully the validity of an agreement to which she was a party, to the perform-

ance of the terms of which by the other parties she assented, and under which she claimed and received and now enjoys, all the benefits it gives to her.   It is no answer to say that she is only acting as a trustee.   She cannot in such a matter do as a trustee what she cannot do as an individual.   And as to her and both the other trustees it is enough to say that they were not appointed for any such purpose.   In fact they were appointed upon her petition presumably for the furtherance of her interests.   Her petition sets forth that certain moneys which had come into the hands of a receiver appointed by the court of chancery in England belonging to the estate of her father, could not be distributed to the persons entitled in this country, unless trustees were appointed under the will of George A. Cobham, who could properly receive the same and make distribution of them under the will, and for that purpose and to enable her to get her share of those moneys, these trustees, she being one of them, were appointed.   The original trustees were parties to the proceedings under the caveat against the will, and they assented to the withdrawal of the will from probate.   Two others subsequently died and two resigned, but neither the whole of them, nor any of them, ever made any attempt to interfere with the family settlement, or with the orphans' court sale.   In the exercise of their official functions they evidently never considered it necessary to take any such action.   The period of their inaction therefore must be counted as laches as well against their successors as themselves.   A period of sixteen years without any action must be taken as gross laches which cannot be condoned by a fresh appointment of trustees.

Contemplated therefore in any aspect the case of these plaintiffs is destitute of merit.   There was no actual fraud in the original agreement, the orphans' court sale was a valid and effective proceeding to divest all title under the will, and no present allegations against it are sufficient to avoid it or affect it in any way, and the laches in the institution of any proceeding to invalidate the title acquired by the orphans' court sale is such that it cannot now be entertained.

As Elizabeth Sager is the one person who can be benefited by a recovery in this case, and as she was a party to all the proceedings now sought to be invalidated, and as she still continues to hold and keep all the benefits which came to her out

of those proceedings, she is bound by them if they were not fraudulent, and she cannot be permitted to attack them if they were, either directly by herself or indirectly by trustees appointed at her instance. She cannot be permitted to assert her own fraud and obtain a judicial decree founded thereon.

These considerations make it unnecessary to discuss or decide the question of jurisdiction as to the appointment of the trustees. The assignments of error are all dismissed.

Judgment affirmed.