Noonan Estate.

Argued April 14, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Gerald A. McNelis,* for appellant.

*C. C. Eaton,* for appellees.

OPINION BY DITHRICH, J., July 23, 1948:

This matter is before the Court on appeal from the decree of the Orphans' Court of Erie County dismissing

a petition to set aside a sale of real estate made by the executor, and exceptions to the account of the executor.

Ella M. Noonan died testate February 25, 1946, seized, inter alia, of a house and lot situate in the City of Erie, known at 21 East Third Street. She devised and bequeathed all of her estate to her son, DeVere W. Baker, appellant. She appointed Homer T. Eaton, Esq., executor, and authorized and empowered him to sell all real estate of which she died seized if, in his judgment, he might deem it necessary or advisable in the settlement of her estate. On April 15, 1946, the will was filed for probate and letters testamentary were issued. On May 2, 1946, an inventory and appraisement of the personal estate, amounting to $289.45, was filed. On the same date a statement of debts and deductions necessary in the administration of the estate, amounting to $2,391.30, was also filed, together with a description of decedent's real estate consisting of a lot in Harborcreek Township, appraised for inheritance tax purposes at $175, and the property in question appraised for inheritance tax purposes at $3,000.

On April 29, 1946, the executor entered into an agreement with Beryl Blakely, his private secretary and title examiner, for the sale of the property for a consideration of $3,500 and on May 11, 1946, a special warranty deed for the property was executed and delivered to Mrs. Blakely.

Prior to the sale appellant had expressed his desire and intention to pay the decedent's debts and retain the property and, in fact, had paid some of the debts out of his personal funds until notified by the executor of his appointment under the will, and that he would take over and handle the estate.

Appellant then returned to his home in Baldwin, New York, where, under date of April 8, 1946, he received a letter from the executor stating in part that: "Realizing that you not being in the City of Erie (with obligations against the estate as provided by the will and the various expenses of administration, together

with the judgments as mentioned) the writer, as executor, feels that *it would be unwise for you to advance all these obligations from your personal funds and handle the* premises through an agent with the necessary expenses of said agent's services."

On April 13, 1946, appellant, by letter to the executor, acknowledged receipt of his letter of April 8 and stated, inter alia, "I do not wish to make any decision as to whether or not to sell the property at 21 East Third St., until we learn what the claims against it amount to.

"I feel that your advice is sound, but considering my position *it seems more advantageous to me to hold the property for the income rather than dispose of it.*

"It is necessary for me to earn my living and my health has failed considerable in the last three years.

"Failing eyesight and arthritis are threatening to force me to give up my occupation, and the prospect of a comparatively penniless old age is anything but pleasant.

"*So you can see what any kind of an income would mean to me if it can be worked out.*"

On April 17, 1946, the executor replied, in part, as follows: "Fear that you are under a misapprehension as to the situation relative to the property at 21 East Third Street as an examination of the enclosed will of your mother shows certain duties and obligations vested in the writer in his capacity as executor. These expenditures plus the Department of Public Assistance judgment (which is a lien against the realty) and has been running since 1940, together with the usual expenses of administration of the estate, also funeral bill, markers, etc., would at the present writing indicate the probable necessity of selling the premises under the authority vested in the executor."

On April 22, 1946, appellant replied, stating in part: "I infer from your letter of April 17th that I would not be allowed to retain ownership of the property at

21 East Third St. by paying the charges against it from my own funds.

"Am I correct in this assumption?"

He did not hear from the executor again until by letter dated May 6, 1946, he was informed that the executor had entered into a contract for the sale of the property for $3,500. Following receipt of the letter of May 6, appellant renewed his objection to the sale of the property, reiterated his desire to retain it and pay the debts, and asked if the agreement of sale could not be canceled. To enable his secretary to finance the purchase of the property, the executor took from her and her husband a first mortgage in the amount of $2,800.

Failing in his efforts to have the agreement of sale canceled, appellant petitioned the court to set aside the sale and direct the said Beryl Blakely to reconvey the premises either directly to him or to the executor, and for such other and equitable relief as to the court might seem just and proper. Whereupon, a citation issued upon Homer T. Eaton, executor, and the said Beryl Blakely. They filed a joint answer to the petition denying any impropriety in the sale and praying that the petition be dismissed.

Appellees concede that: "While the executor was of the opinion, under the terms of the will, that the sale of the premises rested wholly within the judgment of the executor, and that he was acting entirely within the power conferred upon him by the will, . . . it would probably have been better and more satisfactory to the beneficiary if the executor had corresponded further with him, advised him of the amount necessary to pay the debts and expenses of the estate, and give[n] him a further opportunity to pay the debts and expenses and take the real estate, if he were able to do so, and, . . . thus 'avoid subsequent adverse reactions.' "

That the executor acted with undue and unseemly haste and with but slight regard for the rights of ap-

pellant in making the sale to his private secretary and in taking a mortgage on the property is not open to argument. He attempts to justify his action on the ground that while the heir and devisee expressed a desire to pay the debts and retain the property, he never made "any offer to pay" the debts and expenses. We consider this a very flimsy excuse. How could the heir be expected to make an offer to pay the debts until he knew what they amounted to? The executor concedes that it would have been better and more satisfactory to the beneficiary if he had "advised him of the amount necessary to pay the debts and expenses of the estate."

In his letter of April 13 appellant said: "I do not wish to make any decision as to whether or not to sell the property . . . until we learn what the claims against it amount to." By letter dated April 17 he was told by the executor that he would be advised "further as soon as we receive additional information" from the Department of Public Assistance as to the amount of its judgment which would "very likely not" be "for at least two weeks." He never was "further advised" until May 6, eight days after the agreement for the sale of the property had been entered into and four days after a statement of the debts and necessary deductions had been filed in the office of the Register of Wills. He was then informed that "We finally received from the Commonwealth of Pennsylvania exact statement of the amount due the department of Public Assistance for funds advanced to your mother during her lifetime." When that information was received was not stated. He was then told for the first time the amount of the total obligations against the estate. But by that time the property had already been sold.

"The heirs or legatees, or those interested in the estate, have ordinarily a right to furnish the necessary money for the payment of decedent's debts and thus remove the cloud on their title to the land arising out

of its liability to be sold for the debts; *and in some states it is considered that no decree of sale for the payment of debts should be made without giving them a reasonable opportunity to pay the debts and thus avoid a sale"*: 34 C. J. S., Exrs. and Admrs., § 554. (Emphasis added.)

This right in principle was recognized by our Supreme Court in *Sager v. Mead,* 171 Pa. 349, 33 A. 355, where a sale for the payment of decedent's debts had been adjudged necessary by the court making the order of sale. The Court said, page 363: "If the sale of the property for the payment of debts was necessary, it was entirely competent for the parties interested in the estate to furnish the money for the payment of the debts, and to take deeds for it in severalty. The necessity for the sale was adjudged by the court which granted the order, and if the present plaintiff . . . or any of the other persons interested desired to question its validity then was the time to do it. If, having the opportunity to do so, as they all had, they acquiesced in the sale, and stood by and permitted title to be taken, a division of the property into several parcels to be made, and an acceptance of title by each distributee of the parcel allotted, and possession to be taken and maintained for sixteen years, such persons cannot now call in question such a title."

But in the present case the appellant acted promptly in attempting, first, to have the agreement of sale canceled, and, failing in that, to have the sale set aside. He produced testimony to prove that the property was worth at least $2,000 more than it was sold for, that at the time it was sold a decided seller's market existed in Erie, and that the property, at comparatively little expense, could have been put in condition where it would have produced an income sufficient to meet appellant's meager needs. He had told the executor that "any kind of an income would mean" a great deal to him, faced as he was with the "prospect of a compara-

tively penniless old age." Mere inadequacy of price would not be sufficient ground for setting aside the sale, but it is a circumstance to be carefully considered with the other circumstances in the case in determining whether the sale was contrary to public policy. That is the rule in Pennsylvania.

.The terminology in Restatement, Trusts, § 170, of "Duty of Loyalty" embraces the same principle as the Pennsylvania rule of "Public Policy." Under "Duty of Loyalty" in the Restatement, it is stated that "(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." That is the public policy of Pennsylvania. Under *"Comment on Subsection (1) e."* the following appears: "If . . . it is shown that the trustee in making the sale was improperly influenced by his relationship to the purchaser, or even his friendship for the purchaser, so that he sold the property for less than he could have obtained from others, or otherwise abused his discretion in making the sale, he commits a breach of trust."

Here, we find a palpable abuse of discretion. Had the sale been to an agent or a partner of the executor, or to a member of his law firm, there could be no question as to its voidability. Why then should an exception be made of a sale to one in the confidential relationship of a private secretary? What was said long ago in *Beeson v. Beeson*, 9 Pa. 279, at pages 284, 285, may most appropriately be quoted here: "This brings him directly within the reason of a policy which, looking to a possible clashing of interests, prohibits him to become an unconditional purchaser. The operation of the prohibition is not confined to those who are personally active in effecting a sale. It extends to all upon whom the act of a party or of the law casts a fiduciary relation to the subject of the trust, and which they are not permitted to shake off at pleasure, to assume. it may be, an attitude hostile to the persons beneficially interested: . . . It embraces all who, being employed

or concerned in the affairs of another, have thus enjoyed a means of information that might be employed in destruction of the interests they are bound to promote, were the agent at liberty to convert himself into an owner against the consent of the principal. The circle of the rule is therefore extended to include special agents . . . commissioners of bankrupts . . . solicitors of the commission . . . auctioneers, creditors who have been consulted as to the mode of sale . . . attorneys and solicitors . . . *and others holding similar relations of confidence. . . . The present is within the spirit of these cases . . .*" (Emphasis added.)

In *Rich v. Black & Baird*, 173 Pa. 92, 33 A. 880, it was held, page 98: "The rule of public policy which avoids, at the instance of the cestui que trust, purchases made by agents for sale is *practically absolute in its character*. Courts of equity view such transactions with jealous eye; . . ." (Emphasis added.)

In *Continental Bk. & Tr. Co. of N. Y. v. American Assembling Machine Co., Inc.*, 350 Pa. 300, 38 A. 2d 220, it was said, page 308: " 'The rule of equity which prohibits a trustee for sale from purchasing the trust property, is not founded on his being necessarily guilty of fraud in so doing. It is a rule of public policy which applies in all cases, whether there be fraud or not, and indeed its great object is to prevent fraud by taking away the temptation to commit it. Another reason for the rule is the difficulty, if not impossibility in many instances, of ascertaining whether there was fraud or not': Webb v. Dietrich, 7 W. & S. 401, 402."

And in *Tanner's Estate*, 218 Pa. 361, 67 A. 646, where a sale of a minor's interest in land was made by a guardian to himself and others it was held that that fact alone was sufficient ground for setting aside the sale without proof of fraud or inadequacy of price, the Court saying at page 365: "It is a rule founded on

public policy to prevent a conflict between interest and duty."

Whether or not the sale should be set aside depends upon whether the purchaser had notice of the trust and the breach thereof. 65 C. J., Trusts, §§ 647, 648.

Here, the purchaser had full knowledge of all the facts. She was in charge of the correspondence between the executor and the cestui que trust. The correspondence speaks for itself. She was an experienced title examiner and she was also one of the paid appraisers of the personal property. One of the conditions of the sales agreement for the realty was that the purchaser also be allowed to purchase the furniture at the *appraised* value. To sustain this sale would work actual injury to the devisee, tend to encourage breaches of trust, and violate a wise rule of public policy. To all practical intents and purposes the executor was the real purchaser.

Mrs. Blakely has made a number of repairs and improvements to the property, but these were all made after she had notice of the protests of the heir and devisee, some even having been made after the hearing on his petition to have the sale set aside. In view of all the circumstances we do not feel that she is entitled to be reimbursed for more than the purchase price and the necessary expenses of the sale. The amount she has since expended on the property is offset by the use and occupancy she has had of it for more than two years.

Only one other matter remains to be disposed of and that is the additional counsel fee of $100 allowed the executor in this proceeding. In view of the fact that counsel was a law partner of the executor and represented the purchaser, as well as the executor in this proceeding, we feel that the additional counsel fee should not be allowed.

The assignments of error are sustained; the decree is reversed; and it is ordered and directed that Beryl

Blakely, appellee, reconvey to appellant the house and lot situate in the City of Erie, known as 21 East Third Street, upon the payment to her by appellant of the sum of $3,500, and the necessary expenses of the sale of the property to her by the executor; the costs to be paid by appellees.

Judge HIRT took no part in the consideration or decision of this case.