## Gray Estate

*Frederick L. John II,* for administrator.

*James D. McClister,* for exceptant Turney W. Gray.

*Louis H. Ceraso,* for exceptant George Minnick.

HOUSE, *P.J.,* January 27, 1978—Isaiah Samuel Gray died intestate on January 3, 1964. At the time of his death Isaiah Gray's only assests were $638 in cash and a thirty-eight-acre farm located in Madison Township, Armstrong County, Pa.

From 1964 until 1973, no action was taken to settle the estate. During this time the farm grew up in weeds and the buildings lay in a state of disrepair. George C. Minnick, a grandnephew of Isaiah Gray, saw that the farm was lying fallow and thought he might acquire it with the idea of building a home on the farm to which he could retire. George Minnick discussed the matter with attorney Fred L. John who advised him that the estate would have to be settled if he was to acquire the property. Attorney John said that an administrator had to be appointed. At George Minnick's suggestion, his brother, John Minick (spelled with one "n") was appointed administrator on January 29, 1973.

John Minick, being an amateur genealogist, came up with a list of 33 known heirs of Isaiah Gray. These heirs consisted mostly of grandnieces and grandnephews because Isaiah Gray's wife and some 16 known brothers and sisters had all predeceased him.

John Minick and George Minnick contacted a number of the heirs that lived in the western Pennsylvania area. They explained to them that they wanted to settle the estate and that George Minnick wanted to purchase the farm. None of the heirs contacted objected to the transaction. John Minick, as administrator, conveyed the farm to George Minnick by deed dated August 1, 1973 and recorded in Armstrong County Deed Book 548, page 749.

The only assets of the estate were the farm and $638 cash. The cash had previously been expended on Isaiah Gray's funeral. This left only the farm to cover the costs of administration and other debts of the estate. The bills of the estate totaled $2,427.60, excluding the $638 previously expended on the funeral. George Minnick paid all these outstanding

bills with his own personal checks. He was reimbursed $105 from the estate, leaving a total payment of $2,322.60 which included the $1,500 paid for the farm. Thus, George Minnick paid out of his own pocket $822.60 of the estate's debts over and above the purchase price paid for the farm by him.

Exceptions were filed to the first and final account by Turney W. Gray, also a grandnephew of Isaiah Gray, who was unknown to George Minnick or John Minick, alleging the sale of the farm was at an inadequate price.

An auditor was appointed by this court to review the matter. The auditor recommended that the sale of the farm to George Minnick be set aside because of self-dealing and because of the administrator's failure to comply with section 3351 of the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, as amended, 20 Pa.C.S.A. §3351. This section requires personal representatives under bond to file additional security, or to ask leave of court for the waiver of additional security, when selling real estate of the estate.

Exceptions were filed to the auditor's report by George Minnick. The exceptions allege that the report was beyond the scope of the exceptions filed by Turney Gray, and that the findings are contrary to law and contrary to the facts of the case.

After having received written briefs and oral argument, the matter is now before us for disposition.

## DISCUSSION

The matter now before the court presents a recurring problem faced in the administration of intestate estates. That problem involves the powers and

duties of an administrator in selling real estate. More specifically, to whom and at what price can an administrator sell real estate.

## I. PLEADINGS

George Minnick has consistently maintained that Turney Gray's exceptions to the first and final account of Isaiah Gray's estate do not set forth grounds for setting aside the sale. Turney Gray's exceptions allege that the sale of the farm to George Minnick should be set aside because an inadequate price was received. We agree that under section 3360 of the Probate, Estates and Fiduciaries Code, inadequacy of price is not grounds for setting aside a sale made by a personal representative. Nonetheless, we believe that genuine issues concerning the validity of the sale do exist. Moreover, the parties have been afforded ample opportunity to explore all issues concerning the propriety of the sale in their briefs and at the hearing before this court.

Pennsylvania Orphans' Court Rule 2.1 says: ". . . The court at every stage of any action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties in interest." The Supreme Court has said that failure to plead certain issues in challenging an administrator's account was not fatal when the issues were set forth in the trial memorandum and briefs. The Supreme Court cited Rule 2.1 in holding the lower court improperly refused to review the omitted issues: Estate of Chiara, 467 Pa. 586, 359 A. 2d 756 (1976); Estate of Frances C. Brown, 33 Fayette 49 (1970).

Moreover, we feel that it is the court's duty to explore all issues concerning the proper adminis-

tration of an estate, especially those that suggest breach of the personal representative's powers and duties.

## II. FAILURE TO FILE PETITION FOR WAIVER OF ADDITIONAL SECURITY

The auditor indicated that the administrator's failure to file for waiver of additional security (under section 3351 of the Probate, Estates and Fiduciaries Code) is grounds for setting aside the sale. He cites Stewart Estate, 22 Fiduc. Rep. 257, 62 Luzerne 45 (1972), in support of his view. There the Luzerne County Orphans' Court set aside a sale of real estate because of the administrator's failure to file for additional security or waiver thereof.

The facts in Stewart Estate show that an administrator's bond was filed for $5,000 and the real estate was sold for $3,000, while the adjusted estate was valued at over $50,000. In addition, first the administrator failed to file for additional security when the real estate was sold. Also, the original administrator in the estate had been surcharged for over $24,000 because of neglect in handling the estate. This surcharge had not been paid at the time the case was decided.

We feel that Stewart Estate does not follow established principles and is distinguishable on the facts. We agree with the commentators in Fiduciary Review, June 1972, at page 3, who said that setting aside the sale in Stewart Estate was too harsh a result.

"Since it was not the administrator's lack of power to make a binding agreement of sale, only his lack of follow through in regard to the security which defeated the sale, the question arises as to

whether the purchasers should be penalized to the extent of their entire investment. Should they not have the alternative of keeping real estate and paying into the estate all or such portion of the purchase price actually lost by the heirs due to the default of the removed administrator who had been surcharged $24,112.22? And, if they are to lose the real estate, should they also lose the value to the estate of the improvements made by them? See Bridgeford v. Groh, 306 Pa. 566."

Moreover, the facts of Stewart Estate are entirely different. There the adjusted estate was valued at over $50,000, while the bond was only $5,000. In the case at bar the bond was for $2,200 and the sale price of the property was only $1,500. We feel that if the administrator had petitioned the court for waiver of additional security we would have summarily granted the waiver by comparing the amount of the bond to the sale price. It should be noted that this court is *not* condoning the failure to comply with the statutory prerequisites in settling estates, and it is emphasized that the proper course of conduct would have been for the administrator to petition for waiver of additional security.

## III. INADEQUACY OF PRICE

Clearly John Minick, as administrator of the estate, had the power to sell the farm at a private sale, *without leave of court or notice to other heirs* under section 3351 of the Probate, Estates and Fiduciaries Code. But it is also his duty to obtain the best possible price for the sale: Bailey Estate, 36 D. & C. 2d 413 (1965); Melcher Estate, 47 D. & C. 2d 332 (1968); and Yetzer Estate, 3 Fiduc. Rep. 469 (1952).

Because section 3360 of the Probate, Estates and Fiduciaries Code specifically says that inadequacy

of price is not grounds for setting aside a contract for the sale of real estate, the only remedy left is to surcharge the administrator for improper execution or neglect of his duties: Brittain's Estate, 28 Pa. Superior Ct. 144 (1905); Schafer's Estate, 66 Dauph. 74 (1954).

But in certain situations a surcharge may be an inadequate remedy.

George Minnick's brief cites §15:04 in Ladner on Conveyancing in Pennsylvania (3d ed. 1961), which speaks directly to the issues involving inadequacy of price. Ladner points out that there are certain situations where a personal representative can sell real estate from an estate at a grossly inadequate price and the heirs can be left without a remedy. Thus, if this sale had been to a stranger who was a bona fide purchaser for value, we could not set aside the sale, no matter what the price, unless fraud, accident or mistake had been proven. In such a situation the only recourse would have been to surcharge the personal representative. If the personal representative was without funds then the heirs would be without a remedy.

This appears to be exactly what happened in Stewart Estate. The first personal representative was surcharged over $24,000 and this amount was not paid. The Luzerne County Court took a legal technicality, failure to file for additional security or waiver thereof, under section 3351, and set aside the conveyance of real estate. As stated previously, this seems to be an improper conclusion and it seems that Stewart Estate is a classic example of the kind of case that Ladner warns about. However equitable the results may have been in Stewart Estate, the law, as written, did not justify setting aside the sale in the absence of clear proof of fraud, accident or mistake.

Additionally, the commentators on Stewart's Estate in Fiduciary Review, June 1972, page 3, would not have been as harsh as even Ladner suggests. The commentators there said that the purchasers should reimburse the estate for the value lost on the sale.

Ladner points out the adoption of a local rule of court may help alleviate the problem. A local rule, such as Allegheny County Orphans' Court Division Rule 17, sets forth the form and requirements of a petition for additional security or waiver thereof, when a personal representative sells real estate. The essential requirement of such a petition is that the fair market value of the property to be sold is set forth, either by its appraisement for Pennsylvania transfer inheritance tax purposes or by affidavits of two qualified persons who have no interest in the sale. Thus, before any agreement of sale is entered into and before any deed is transferred, the court and any interested parties are given the opportunity to determine if the estate is receiving a fair and adequate price for the property. In the absence of such a local rule, the court has very little power to compare the market value of the property being sold to the actual sales price.

We have not adopted a similar rule in this court.

## IV. SELF-DEALING

Notwithstanding the import of the foregoing discussion, the overriding issue in the case at bar involves an examination of the personal representative's powers and duties, in light of the fact that he sold the farm to his brother.

After an extensive review of the record we do not find any intentional and deliberate wrongdoing on the part of either George Minnick or John Minick. What we find is a distant relative of Isaiah Gray

who sees his granduncle's farm growing up in weeds. Rather than permitting this waste to continue, George Minnick inquires about obtaining the farm in order to build a home thereon to which he can retire. After finding out that the estate must be settled, George Minnick suggests that his brother be appointed administrator. The two brothers contact all of Isaiah Gray's heirs that they know of and obtain their approval of George Minnick's purchase of the farm. Out of natural love and affection or, perhaps, self-interest, George Minnick spends several hundred dollars out of his own pocket in order to fully pay certain debts of the estate. The farm is then conveyed to George Minnick, but an unknown heir, Turney Gray, turns up and objects to the sale.

However, even though there be no intentional wrongdoing, a personal representative is held to a very high standard of care.

Justice Cardozo's famous statement on a fiduciary's duties is set forth in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1902), and was quoted in Holmes Trust, 392 Pa. 17, 21, 139 A. 2d 548 (1958):

" ' "Many forms of conduct permissive in the work-a-day world for those acting at arms length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." ' "

It is by this high standard that we must scrutinize the conduct of the fiduciary, John Minick, in selling the farm to his brother George Minnick.

The auditor cites two cases in support of his conclusion that the sale must be set aside: Estate of Frances C. Brown, 33 Fayette 49 (1970), aff'd per curiam 444 Pa. 613, 283 A. 2d 294 (1971), and Noonan Estate, 163 Pa. Superior Ct. 70, 60 A. 2d 374 (1948), aff'd 361 Pa. 26, 63 A. 2d 80 (1949). Indeed Noonan and similar cases are controlling.

The clearest case of self-dealing which would justify setting aside the sale would be where the personal representative purchases the property himself without leave of court: Section 3356 of the Probate, Estate and Fiduciaries Code, 20 Pa.C.S.A. §3356; Miller v. Hawkins, 416 Pa. 180, 205 A. 2d 429 (1964).

However, self-dealing is not limited to the case where a personal representative purchases the property, but includes any cases where the purchaser's relationship with the personal representative *might* influence his decision in making the sale.

Thus, in Noonan, an executor who had a general power to convey real estate under a will could not sell a house and lot to his private secretary, when the devisee expressed an objection to the sale and offered to pay the debts of the estate out of his personal funds so that the sale would not take place.

The Supreme Court in affirming the Superior Court's decision spoke in detail to the issue of self-dealing. The court emphasized that the mere possibility of influence was sufficient basis upon which to find self-dealing.

"The executor was, moreover, guilty of self-dealing, as the circumstances attending the sale disclose. Such a transgression does not lie exclusively in a fiduciary's sale of trust property to himself. Cf. Downing Estate, 162 Pa. Superior Ct. 354,

57 A. 2d 710, affirmed per curiam by this Court: 359 Pa. 534, 535, 59 A. 2d 903. The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in material connection: Downing Estate, supra, at p. 359, citing Scott on Trusts, Vol. 2 §170.12, p. 877, and Restatement, Trusts, §170 (1), Comment h. See also Comment c. of the same section of the Restatement which declares that 'The trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale.' It will be noted that the extent of the fiduciary's disqualifying interest need not be such as 'did affect his judgment' but merely such as 'might affect his judgment': Downing Estate, supra, at p. 360." Noonan, 361 Pa., at 31.

They also noted that the adequacy of price and lack of intentional wrongdoing were not issues in determining whether self-dealing took place.

"Where there is self-dealing on the part of a fiduciary, it is immaterial to the question of his liability in the premises whether he acted without fraudulant intent or whether the price received for his sale of trust property was fair and adequate: see Tracy v. Central Trust Company, 327 Pa. 77, 79, 192 A. 869, citing Everhart v. Searle, 71 Pa. 256, 260, where the following was approvingly quoted from Hare and Wallace's Notes, 1 Lead. Cases in Eq., p. 210—'It matters not that there was no fraud meditated and no injury done; the rule [forbidding self-dealing] is not intended to be remedial of actual wrong, but preventive of the possibility of it.' See

also Tanner's Estate, 218 Pa. 361, 365, 67 A. 646, where a substantially similar quotation, ascribed to the notes to Fox v. Mackreath, 1 Lead. Cases in Equity 239, was adopted. It was also recognized in Tanner's Estate that 'The cases are uniform in declaring that it matters not [when there is self-dealing] how innocent and bona fide, and free from the suggestion of fault, the transaction may be.' In Chorpenning's Appeal, 32 Pa. 315, 316, it was said that '. . . the rule [forbidding self-dealing] is inflexible, without regard to the consideration paid, or the honesty of intent. Public policy requires this, not only as a shield to the parties represented, but as a guard against temptation on part of the representative.' In Downing Estate, supra, President Judge RHODES of the Superior Court succinctly summarized the rule at p. 360 as follows: 'The prohibition against self-dealing is absolute; where the trustee violates it, good faith or payment of a fair consideration is not material.' See also Restatement, Trusts, §170 (1), Comment h. The situation is no different where the breach consists of the fiduciary's marked preference of a third person over the beneficiary in respect of a disposition of estate property. As in the case of self-dealing, such conduct constitutes a violation of the fiduciary's basic duty to the beneficiary. Cf. Downing Estate, supra, at p. 558." Noonan, 361 Pa., at 32-33.

The court went on to say that the determination of whether the sale should be set aside, " . . . depends upon whether she was a bona fide purchaser . . . To be such, she must have paid value for the property without knowledge of the attendant circumstances constituting the executor's breaches." Noonan, 361 Pa., at 33.

Thus, where the fiduciary transfers property to a

person who is not a bona fide purchaser, that purchaser holds the property in constructive trust for the heirs or beneficiaries of the estate. " 'Where a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, . . . if he had notice of the violation of duty, holds the property upon a constructive trust for beneficiary.' " Noonan, 361 Pa., at 34.

Similarly, in the Estate of Frances C. Brown, the Fayette County Orphans' Court set aside a sale of real property to a longtime friend of the administratrix over the protest of closer relatives who wanted the property. The Fayette County Court said that even though there was inconclusive evidence of a conspiracy to defraud the estate, the mere fact that the purchaser had "guilty knowledge" of a sale that would be to their advantage would be sufficient to set aside the sale.

A case arising out of a fact situation suprisingly similar to the case at bar is Yetzer Estate. There the Elk County Orphans' Court cited Noonan at length and held that a sale by an administrator to his brother must be set aside because of the mere fact that the relationship might influence the administrator in the execution of his duties.

When the principles previously discussed are applied to the facts of the case at bar, it is quite clear that this court must set aside the sale from John Minick to George Minnick.

In the first place, it was George Minnick who started the proceedings to settle the estate and this was done specifically for the purpose of acquiring title to the real estate. His brother, John Minick, was appointed administrator for convenience more than anything. In fact, George Minnick paid many

of the debts of the estate with his own personal checks and acted in the capacity of co-administrator in fact if not in name. Although the brothers contacted a number of the heirs of Isaiah Gray in order to obtain their approval of their deal, it seems clear that George Minnick was the only person considered as a possible purchaser of the farm. It would have been very easy for a public sale to have taken place, in which case there would have been no question as to the validity of the sale.

This case presents a classic example of self-dealing and we are left with no alternative but to set aside the sale.

## ORDER

And now, January 27, 1978, after further hearing before the court and submission of argument and briefs, and for reasons contained in the annexed opinion, it is ordered, adjudged and decreed that the exceptions to the report of the auditor be and are hereby overruled and dismissed and the said report of the auditor be and is hereby confirmed absolutely.

It is further ordered, adjudged and decreed that the sale of real estate is set aside and, unless appeal is perfected within 30 days of the date hereof, Henry L. Livengood, Recorder of Deeds of Armstrong County, Pennsylvania, shall mark the record of the administrator's deed from John L. Minick to George Minnick at Armstrong County Deed Book, volume 548, page 749: "Void by Order of Court dated January 27, 1978."

It is further ordered and directed that the administrator shall proceed hereafter to sell the sub-

ject real estate in a manner consonant with the law and the holdings of the annexed opinion.

Costs of this proceeding to be borne by John Minick and George Minnick, personally.